**Mary Jo SCHMERR Plaintiff,**

v.

**UNITED STATES of America; USDA; Secretary of Agriculture, in her official capacity Defendants.**

**No. 4–01–CV–10409.**

United States District Court, S.D. Iowa, Central Division.

Nov. 20, 2002.

Charles E. Gribble, Parrish Kruidenier Moss Dunn Boles Gribble & Cook LLP, Des Moines, IA, for Plaintiff.

John E. Beamer, United States Attorney, Des Moines, IA, for Defendants.

### ORDER

LONGSTAFF, Chief Judge.

THE COURT HAS BEFORE IT defendants' motion for summary judgment, filed August 23, 2002. Plaintiff filed a resistance on October 3, 2002. The motion is now fully submitted.

## I. BACKGROUND

The following facts either are not in dispute or are viewed in a light most favorable to plaintiff.

Plaintiff, Mary Jo Schmerr, is a research scientist at the National Animal Disease Center (NADC) in Ames, Iowa. In 1993, she began research on sheep scrapie, a disease akin to mad cow disease. When plaintiff started her research, the causative agent of sheep scrapie could be detected only after the animals had died of the disease. Plaintiff's goal was to develop a method for earlier detection. She discovered what appeared to be a viable method for detecting the disease in blood drawn from a living animal, and her findings were published in a peer-reviewed journal in the fall of 1999. Because the timing of plaintiff's research coincided with the widescale outbreak of mad cow disease in the United Kingdom, plaintiff's results were of international interest.

Randal Cutlip and William Mengeling were plaintiff's direct supervisors during the time she worked on the sheep scrapie project. According to plaintiff, both men displayed blatant sexist attitudes. Cutlip told her that "while women [are] intellectually capable, they [are] psychologically unsuitable to be scientists because they care[ ] too much about their children." Plaintiff's Appendix at 8, ¶ 3. In 1998, Keith Murray became the Center Director of NADC. Plaintiff claims that Murray knew about the sexist attitudes of the NADC management and fostered the same beliefs himself. After Murray's arrival, she was subjected to numerous career damaging rules and restrictions, none of which were applied to her male colleagues.

In March of 2000, Michaela Kohlickova and Juergen Richt began working at NADC. Plaintiff witnessed Richt belittle Kohlickova, making derogatory remarks about Czech women and their competency as scientists. Plaintiff reported the incident to Carol Moran, the NADC Administrative Officer. Plaintiff was subsequently chastised by Murray, who minimized the significance of the incident and allegedly threatened plaintiff that any further protest would lead to a reduction in resources to her own project. Plaintiff's Appendix at 12–13, ¶¶ 26–29.

In March of 2000, shortly after his dispute with plaintiff regarding the harassment of Kohlickova, Murray instituted a new set of rules with respect to travel, which plaintiff claims was only applied to her. Unlike the male scientists, plaintiff's travel requests were subject to special review by Murray, and her travel was limit-

ed, at least initially, to four or five days per month. When plaintiff sought travel approval in the following months, her privileges were cut again. She was permitted to travel to only three of six conferences that were scheduled. As a result, plaintiff was forced to decline invitations to speak at these conferences and missed valuable career advancement opportunities.[1] After plaintiff initiated proceedings before the Equal Employment Opportunity Commission (EEOC), Murray further constricted her travel restrictions, allowing her to attend only four conferences per year.

Defendants deny that Murray had an improper motive, and they maintain that the restriction on plaintiff's travel was due to budgetary restraints. Plaintiff counters that more than sixty to eighty percent of her travel costs would have been paid by funds external to the USDA. She contends that no restraints were placed on any of the male scientists, and that a male scientist was approved to attend an international conference, even though he was not invited to speak and his travel costs were not covered externally. Plaintiff's Appendix at 19–24, ¶¶ 30–42; and at 56, (Rasmussen Affidavit).

In addition to the travel restrictions, plaintiff asserts that her performance evaluations were a product of gender-based discrimination by NADC. Evaluations at the Center are done yearly and are meant to measure a scientist's progress through objective criteria relating to achievements in the past year. Each scientist is assigned a rating of "exceeds," "meets" or "does not meet." Plaintiff claims that she received lower scores than her male colleagues, despite her greater achievement, as measured by objective criteria in the evaluation process. For example, in the category measuring performance with respect to procurement of outside funding or technology transfer, other male scientists who brought in less funding for projects within the lab and who received fewer transfers of their technology to other laboratories, received higher scores than plaintiff.[2] Plaintiff's Appendix at 30–34, ¶¶ 53–60.

Plaintiff also alleges she was treated differently than her male counterparts with respect to staffing. While plaintiff's laboratory was expected to make do with the temporary, untrained help of students, her male colleagues were allowed experienced, fully trained technicians. When plaintiff found her department in need of greater staff, subsequent to her report of Kohlickova's harassment by Richt, Murray refused to fill the open positions. Of particular noteworthiness is a staff position within plaintiff's department that opened up in January 2001. A hiring freeze within the government prevented filling this position until March 2001, but Murray continued to delay hiring staff even after the hiring freeze was lifted. Only after plaintiff filed her petition with this Court did Murray authorize the position to be filled. Male scientists within the office experienced no similar delays in the hiring of staff, although other women within the Center experienced similar exclusion for resources. Plaintiff's Appendix at 28–30, ¶¶ 47–52; 51 (Halling Affidavit).

Plaintiff next claims that she received an unwarranted official reprimand for speak-

---

1. Plaintiff contends that conferences are vital to the advancement of a scientist's career, as they enable the scientist to exchange ideas with others involved in similar experiments and to gain recognition needed for promotions. Plaintiff had received a number of prestigious invitations to speak at important conferences. *See* Plaintiff's Appendix at 19–24.

2. Plaintiff claims that she received a rating of "meets," while Dr. Hamir, male scientist who allegedly performed worse than plaintiff, received a rating of "exceeds."

ing with the media. The reprimand was spurred by an article appearing in the Wall Street Journal that contained references to plaintiff's complaint with the EEOC. Murray accused plaintiff of providing an unauthorized interview to the Wall Street Journal and having provided a number of such interviews in the past. Plaintiff contends that she did, in fact, request and receive permission to do this interview. *See* Plaintiff's Appendix at 25, ¶ 45; 45–46 (Goodwin Affidavit); 50 (Halling Affidavit). According to plaintiff, the references to prior unauthorized interviews in the reprimand only served to fabricate a pattern of behavior that did not exist. She claims that each interview cited either never took place or involved informal discussions of issues that would not be classified as "sensitive," as defined by NADC. *Id.* at 24–28, ¶ 43–46.

Plaintiff next challenges NADC's decision to cancel her sheep scrapie research project. NADC Director, Keith Murray, began challenging the validity of plaintiff's project in the summer of 2000. He ordered blind validation tests to determine whether plaintiff's technology was able to consistently identify sheep scrapie in an infected sample. *Id.* at 12–16, ¶¶ 13–20. Defendants maintain that they required validation of plaintiff's research because she had been working on the project for five years with no demonstration of diagnostic utility. *See* Appendix in Support of Defendants' Motion for Summary Judgment at 128.

Plaintiff did not begin working on the test in earnest until December of 1997, approximately three years before the forced study. *Id.* at 10–12, ¶¶ 8–13; 39 (Goodwin Affidavit). According to scientist, Kathryn Goodwin, three years was more than a reasonable period of time for developing such a complicated test. *Id.* at 39 (Goodwin Affidavit). Nevertheless, Murray ordered the validation tests while plaintiff's sheep scrapie detection test was still in the formative stages. *Id.* at 12, ¶ 13. He claimed that the results from the validation tests proved that plaintiff's sheep scrapie test was not viable. *Id.* at 12–17, ¶¶ 13–25. However, when plaintiff's sheep scrapie tests were implemented in a manner consistent with scientific principles, the results were promising. *Id.* at 11, ¶ 11. In support of her claim, plaintiff notes that since the termination of her project, several other laboratories using plaintiff's technology have been successful in utilizing it and continue to find it a viable method for detecting sheep scrapie. *Id.* at 71, ¶ 4 (Jackman Affidavit).

Plaintiff alleges that the blind validation tests were initiated with the goal of discrediting her as a scientist, as evidenced by the forced performance of the tests in a manner inconsistent with scientific principles and the regular practice of the NADC. *Id.* at 59, (Rasmussen Affidavit). First, the tests were demanded while the process was still in development, at a time when there were known technical difficulties with the components and instrumentation. *Id.* at 39 (Goodwin Affidavit); 12, ¶ 13; 71 ¶ 3 (Jackman Affidavit). Second, plaintiff was not allowed input or information about the process of planning the blind studies, which was contrary to NADC's usual practice. *Id.* at 39 (Goodwin Affidavit); 15 ¶ 20. Third, the samples provided for the first blind test showed signs of tampering. Some contained blood from other types of animals, some contained blood clots, and some contained an insufficient amount of blood for a proper sample. *Id.* at 41 (Goodwin Appendix). In the opinion of Roy Jackman, a molecular biologist and non-USDA employee who studies sheep scrapie, the methodology utilized in the blind validation tests was defective in several respects and was not calculated to lead to a positive result. He claims that it "was both scienti-

fically and practically unsound to base any judgments of the validity of [plaintiff's sheep scrapie detection process] under these conditions." *Id.* at 71, ¶ 3 (Jackman Affidavit).

Murray ordered the first blind study just one month after plaintiff filed her complaint with the EEOC. Plaintiff's department was understaffed at that time, yet Murray imposed an unreasonable timeline for performing the tests. *Id.* at 39–41 (Goodwin Affidavit). Plaintiff argues that given the unsound methodology, the time restrictions, and the chronology of events, the blind tests Murray required could only have been conceived for retaliatory purposes.

Following the first set of blind validation tests, plaintiff continued to work to eliminate the technical difficulties with the sheep scrapie detection process she was developing. Plaintiff greatly improved her sheep scrapie test. Murray nonetheless ordered a second set of blind validation tests. Again the tests were allegedly required to be done without adequate staff and under unreasonable time pressure. Despite Murray's insistence that there was extreme urgency in getting the testing done, however, the samples were not presented to plaintiff for six months, and management did not issue an evaluation of the sheep scrapie test until several months after the validation test results were calculated. To this day, plaintiff has still not been given the code to the second validation test, which would allow her to perform an independent evaluation of the success of her sheep scrapie detection technology. According to Goodwin, a scientist with forty-seven years of laboratory experience, "[n]o reputable organization which regulates standards and tests would find this acceptable." *Id.* at 43 (Goodwin Affidavit).

On April 29, 2002, Murray informed plaintiff that her sheep scrapie project was being cancelled based on the results of the two blind validation studies. In this meeting, Murray told plaintiff that her test was not viable. He informed her that she would be transferred to a new project, without demotion, where she could begin to develop a new area of expertise. Plaintiff claims that this transfer, though not a demotion per se, caused great loss to her career. She asserts that further promotion before retirement has effectively become impossible due to the time required to develop expertise in a new area and receive recognition that is required for promotion.

Finally, plaintiff contends that other women at NADC suffered from a hostile work environment. Shirley Halling, a microbiologist at NADC in Ames, has "experienced some of the same discriminatory attitude and harassment based on gender that Dr. Schmerr has expressed in her EEO complaint and lawsuit." *Id.* at 51 (Halling Affidavit). Like plaintiff, Halling asserts that male scientists were repeatedly assigned more technicians and resources than female scientists. She claims that pornography was downloaded on government computers in the unit, and a picture of women in bikinis was posted in a common area. She further alleges that a male in her unit said that he would "get her." *Id.* In response to these episodes, a NADC manager told Halling that it was just "boys being boys." *Id.* Halling also asserts that NADC director, Murray, acted in ways that have a chilling effect on females. She claims Murray intimidated women by shouting at them; that he treated them unprofessionally at meetings; and that he shunned women scientists at a social event at the laboratory. *Id.*

Plaintiff filed the present action on July 3, 2001, alleging that defendants are liable under theories of Sexual Harassment (Count I), Disparate Impact (Count III),

and Retaliation (Count V), pursuant to 42 U.S.C. § 2000e, and violation of the Equal Pay Act, pursuant to 29 U.S.C. § 206 (Count VII).[3] In their Motion for Summary Judgment, filed August 23, 2002, defendants challenge the existence of a genuine issue of material fact with respect to each of plaintiff's claims. They also challenge plaintiff's entitlement to punitive damages. Plaintiff concedes that her Disparate Impact and Equal Pay Act claims are appropriate for summary judgment. *See* Brief in Support of Plaintiff's Resistance to Defendant's Motion for Summary Judgment Motion at 15. She also concedes that punitive damages are not an available remedy for the remainder of her claims. *Id.* Thus, the Court must decide only whether defendants are entitled to summary judgment on the Sexual Harassment and Retaliation claims.

## II. APPLICABLE LAW AND DISCUSSION

### A. Summary Judgment Standard

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the court's function is to determine whether a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Id.* at 248, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th cir.1996). "Because discrimination cases often turn on inferences rather than on direct evidence," the court is to be particularly deferential to the nonmovant. *EEOC v. Woodbridge Corp.,* 263 F.3d 812, 814 (8th Cir.2001) (citing *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994)). "Notwithstanding these considerations, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.*

### B. Sexual Harassment

 Title VII of the Civil Rights Act of 1964 provides: "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion,

---

**3.** For reasons unknown to the Court, in her complaint plaintiff numbered her four claims I, III, V, and VII.

sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1377 (8th Cir.1996). Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

█ In order to state a claim for sex discrimination based on a hostile environment, plaintiff must demonstrate: (1) membership in a protected group; (2) the occurrence of unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of employment. *Beard v. Flying J. Inc.,* 266 F.3d 792, 797–98 (8th Cir.2001). Defendants contend that there is no material issue of fact with regard to the third and fourth elements.

● *Was the Harassment Based on Sex?*

█ Harassment need not be explicitly sexual in nature to be based on sex. *Carter v. Chrysler Corp.,* 173 F.3d 693. In evaluating whether harassment is based on sex, "[t]he critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris,* 510 U.S. at 25, 114 S.Ct. 367). "Evidence that members of one sex were the primary targets of the harassment is suffi-

cient to show that the conduct was gender based for purposes of summary judgment." *Quick,* 90 F.3d at 1378.

█ Plaintiff argues that there is sufficient evidence in the record to create a fact issue with respect to whether plaintiff was subjected to disadvantageous conditions of employment to which members of the other sex were not exposed. First, plaintiff alleges that she was forced to perform "validation tests" that had no basis in science. She was not allowed input into the tests, was not allowed the information to independently evaluate the tests, and was forced to do the tests under time pressure without adequate staff. According to plaintiff, no male was required to do similar validation testing on their projects. Second, plaintiff contends that, unlike her male counterparts, she was prevented from traveling to conferences and publishing manuscripts important to the advancement of her career. Third, plaintiff argues that her staffing needs and performance evaluations were measured under standards less advantageous than the male scientists. Finally, Plaintiff alleges that other women were also mistreated at NADC. She claims that Murray intimidated female scientists by shouting at them, and that he treated them unprofessionally at meetings. She further claims that NADC management failed to prevent Juergen Richt from harassing Michaela Kohlickova after it became aware of his misconduct.

Defendants deny plaintiff's allegations and offer their own lawful explanation for the decisions made at NADC. Indeed, the factfinder may ultimately conclude that defendants' actions were not engendered by an animus toward women. However, "the court's role on summary judgment is not to find facts or to construe inferences in favor of a moving party." *Carter* 173 F.3d at 701. As the Eighth Circuit has noted,

"Motive may need to be proved by the use of inferences so summary judgment may often not be an appropriate means for resolving this element." *Id.* (citing *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir.1997); and *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994)). This Court finds that plaintiff produced sufficient evidence to establish material issues of fact on whether the alleged harassment of plaintiff was based on sex. The Court must therefore address the fourth element of plaintiff's prima facie case: whether the alleged harassment affected a term, condition or privilege of employment.

● *Was a term, condition or privilege of employment affected?*

██ For harassment to have affected a term, condition or privilege of employment, the harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Quick*, 90 F.3d at 1378. Whether an environment is hostile or abusive cannot be determined by mathematical calculation, but requires consideration of the entire record and all surrounding circumstances. *Id.* These considerations may include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. To clear the "high threshold of actionable harm," *Duncan v. General Motors*, 300 F.3d 928, 934 (8th Cir.2002), plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

There is no bright line for determining when this "high threshold of actionable harm" is met, but the Eighth Circuit has provided some guidance. In *Quick v. Donaldson*, 90 F.3d 1372, 1374 (8th Cir. 1996), an employee claimed that co-workers "bagged" [4] him in the groin over one hundred times in a nine-month period. The employee claimed that on one occasion his testicles were squeezed so hard that he nearly passed out from pain. In addition to the physical torture, he was also verbally taunted with names such as "queer" and "pocket lizard licker." The district court granted the defendant's motion for summary judgment. *Id.* It found that the misconduct was not of a genuine sexual nature and therefore was not sexual harassment. *Id.* The Eighth Circuit reversed, stating, "Whether or not these actions, when viewed in the totality of the circumstances, constituted prohibited sexual harassment remains a genuine issue of material fact for trial." *Id. See also, Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir.2001) (holding that plaintiff produced sufficient evidence to create a submissible case of sex discrimination, where testimony indicated that over a three-week period she had been subjected to numerous incidents where her breasts had been touched).

██ While it may be strong evidence, the Eighth Circuit has made it clear that physical assault is not a prerequisite for establishing sexual harassment. In *Carter v. Chrysler Corporation*, 173 F.3d 693, 702 (8th Cir.1999), Carter, a factory worker, produced evidence that she experienced "a host of indignities over the course of some two years." One of her co-workers stared at her in a hostile manner, called her "bitch almost every other day, and fre-

---

4. "Bagging" was described as the intentional grabbing and squeezing of another person's testicles. *Id.*

quently cursed, whistled, and 'gave her the finger.'" *Id.* at 696. Another co-worker brought Playboy magazines to work and read them in Carter's line of sight. Sexual gestures were frequently made towards her, and sexual insults about her were written on the walls of the company restroom. *Id.* at 702. In addition, dead animals, threatening notes, foul-smelling material, and a picture of a naked man were put in Carter's work area. *Id.* The Court of Appeals found that on such a record a factfinder could find the harassment sufficiently severe or pervasive to create liability under Title VII. *Id. See also, Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1327 (8th Cir.1994) (holding that summary judgment was inappropriate where manager showed a videotape containing topless women at a company meeting, a female stripper performed at a company meeting, a manager told a joke about masturbation, and managers attended lewd "closed parties" where male workers were accompanied by "road whores" who engaged in sexual activities).

The Eighth Circuit also found that summary judgment was inappropriate in *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1266 (8th Cir.1997). In that case, Schweiss, the head of the anesthesiology department, "frequently and regularly made derogatory comments toward Smith and at least one other female resident." *Id.* at 1264. He showed Smith disrespect by addressing her by her first name, while using "Doctor" and last names for male residents. He referred to her as an "anesthesia babe," and he told other doctors that Smith was selected to fill a female quota. *Id.* at 1262. Schweiss also told Smith that "women ought to be married and home nursing babies." Evidence showed that Schweiss purposely altered his rotation schedule so that he could "get to" Smith by subjecting her to additional ridicule. *Id.* As a result of stress from the harassment by Schweiss, Smith was hospi-

talized twice. The Eighth Circuit held that a jury should determine whether the abuse was sufficiently "severe or pervasive" to be actionable under Title VII. *Id.* at 1265.

In stark contrast to *Smith,* is the Eighth Circuit's more recent Title VII decision, *Duncan v. General Motors,* 300 F.3d 928 (2002). Booth, a training coordinator for General Motors Company, directly propositioned Duncan for a sexual relationship during work hours. *Id.* at 931. She rebuffed his advances, and thereafter Booth became more critical of her work. *Id.* At trial, Duncan testified to additional incidents of Booth's inappropriate behavior. For example, when Duncan expressed interest to be considered for an illustrator's position, Booth told her to draw a planter that he kept in his office. The planter was shaped like a slouched man wearing a sombrero and had a hole in the front of the man's trouser's, allowing a cactus to protrude from the groin area. *Id.* Previous applicants for the illustrator's position were required to draw automotive parts, not Booth's lewd planter. *Id.* at 931–32. Duncan also testified that the screen saver on Booth's computer displayed a picture of a naked woman, and that on two occasions, Booth showed her a child's pacifier that was in the shape of a penis.

Booth's perverted decor was not the only thing that contributed to an unpleasant work environment. Evidence showed that Booth unnecessarily touched Duncan's hand on four or five occasions. *Id.* at 931. He also put a poster on a bulletin board that portrayed Duncan as the president and CEO of the "Man Hater's Club of America." *Id.* at 932. The poster contained a number of sexist remarks, including a statement that women "must always be in control of … sex." *Id.* Booth ordered Duncan to type a draft of the beliefs

of the "He–Men Women Hater's Club." The beliefs included the following:

- Constitutional Amendment, the 19th, giving women [the] right to vote should be repealed ...
- Women really do have coodies [sic] and they can spread
- Women are the cause of 99.9 percent of stress in men
- Sperm has a right to live
- All great chiefs of the world are men
- Prostitution should be legalized

*Id.* at 932. Duncan refused to type the beliefs and resigned two days later. *Id.*

A jury found in favor of Duncan on her sexual harassment claim, and the district court denied defendant's post-trial motion for judgment as a matter of law. *Id.* at 930–31. The Eighth Circuit reversed. It held "as a matter of law that Duncan did not show a sexually harassing hostile environment sufficiently severe or pervasive" to constitute a Title VII violation. *Id.* at 935. In the Eighth Circuit's view, Duncan "failed to show that these occurrences in the aggregate were so severe and extreme that a reasonable person would find that the terms or conditions of Duncan's employment had been altered." *Id.*

With this interesting tapestry of case law serving as a backdrop, the Court turns to plaintiff's allegations in the case at bar. Plaintiff claims that she was harassed as follows: 1) that her supervisors, Dr. Cutlip and Dr. Mengeling, made statements that "women are intellectually, but not emotionally, suited to be scientists because they care too much about their children;" 2) that her performance evaluation did not accurately reflect her performance; 3) that she was required to submit special reviews and time requirements for studies, while no similar demands were made of male scientists; 4) that her travel requests were denied or delayed; and 5) that her sheep scrapie project was cancelled. Plaintiff alleges that these actions were

taken against her because of her gender. The Court finds that even if proven, these occurrences do not constitute hostile environment sexual harassment under Title VII. Unlike the plaintiffs in *Quick* and *Beard,* the plaintiff in this case was not subjected to anything physically threatening. She was not continuously verbally assaulted like the plaintiff in *Smith,* nor was she repeatedly attacked with rude sexual gestures and sexual insults like the plaintiff in *Carter.* The severity of the alleged misconduct in this case pales in comparison to the sexual harassment at issue in *Duncan,* a case in which the Eighth Circuit held that the "high threshold" of Title VII was not met. Because plaintiff has not presented sufficient evidence that the alleged harassment "severely or pervasively altered a term, condition or privilege of plaintiff's employment," as those terms are understood in the Eighth Circuit, defendants' motion for summary judgment on plaintiff's sexual harassment claim must be granted.

C. Retaliation

Plaintiff also filed a claim of retaliation, in violation of Title VII, 42 U.S.C. § 2000e–3(a). Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a case of retaliation, plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) the adverse action occurred because of her protected activity. *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir.1997). Once a plaintiff has made a prima facie showing, the burden shifts

to the employer to articulate a legitimate nondiscriminatory reason for its actions. *Cross v. Cleaver*, 142 F.3d 1059, 1071–72 (8th Cir.1998). If the employer meets its burden, the presumption of retaliation disappears. *Id.* at 1072. The employee must then present evidence capable of proving the employer's proffered reasons were pretext for unlawful retaliation. *Id.*

 The first prong of the prima facie case requires plaintiff to show that she engaged in protected activity. Title VII protects activities ranging from filing a complaint to expressing a belief that the employer has engaged in discriminatory practices. 42 U.S.C. § 2000e–3; *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713 (8th Cir.2000). Plaintiff engaged in three protected activities: reporting the sexual harassment of Kohlickova; initiating her complaint with the EEOC; and filing her Complaint with this Court. The next question is whether plaintiff suffered an adverse employment action.

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir.2000) (citing *Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir.1999)). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not[.]" *Id.*

 Viewing the evidence in the light most favorable to the nonmoving party, and giving her the benefit of all reasonable inferences that may be drawn from the facts alleged, the Court finds that plaintiff has suffered a change in employment that significantly affects her future career prospects. Plaintiff states in her affidavit that the termination of her project had a negative impact on her career. Plaintiff's Appendix at 30. Plaintiff spent a number of years on the sheep scrapie project, and the process she was developing gained worldwide recognition. *Id.* at 9–12, ¶¶ 6–12. Plaintiff argues that the success she achieved with the sheep scrapie project presented career opportunities that will likely be unavailable in the future, and she claims that it may take her many years to gain a similar level of expertise in another area. The issue should be left to the jury to determine whether plaintiff's transfer involved "only minor changes in working conditions," *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.1997), or was instead a "tangible change in working conditions that produc[ed] a material employment disadvantage." *Spears*, 210 F.3d at 853. *See Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir.1997) (holding that summary judgment was inappropriate on retaliation claim where plaintiff alleged that supervisor provided negative references to plaintiff's potential employers because she had complained about his harassment); *Davis v. City of Sioux City*, 115 F.3d 1365, 1369, (8th Cir.1997) (holding that employee's transfer to a slightly higher paying position after she complained of supervisor's sexual harassment was sufficiently adverse to support her retaliation claim, where her new position lacked supervisory status, had fewer opportunities for salary increases, and offered little opportunity for advancement).

In arguing that plaintiff has not suffered an adverse employment action, defendants heavily rely on *Jacob–Mua*, 289 F.3d 517 (8th Cir.2002). In that case, one of the plaintiffs, Klopfenstein, a scientist at the Lincoln, Nebraska, National Agroforestry Center, wrote a letter to the civil rights office of the United States Department of Agriculture, expressing concern about the Lincoln office's intolerance of cultural dif-

ferences. *Id.* at 520. Three months later, the agency informed Klopfenstein that his job was unfunded, and that the Forest Service would attempt to find him another position in the country. *Id.* Against his wishes, he was transferred to Moscow, Idaho. *Id.* Klopfenstein then brought a Title VII action, claiming that as a result of his expression of concern about race retaliations in the office, he was demoted. *Id.* He alleged that "he was transferred against his wishes, that his laboratory was dismantled, and that he was denied promotion opportunities, salary advances and fringe benefits." *Id.* at 521. The district court granted summary judgment for the government, and the Eighth Circuit affirmed. It held that Klopfenstein "failed to show adverse employment action through a 'material employment disadvantage, such as a change in salary, benefits, or responsibilities.'" *Id.* (quoting *Bradley v. Widnall,* 232 F.3d 626, 630–31 (8th Cir. 2000)).

■ Unlike plaintiff Klopfenstein in *Jacob–Mua,* Schmerr has alleged facts that show she has incurred a change in responsibilities. Before filing this suit, plaintiff was responsible for developing a test that could identify the causative agent of sheep scrapie in living animals. As previously discussed, because the timing of plaintiff's research coincided with the wide-scale outbreak of mad cow disease in the United Kingdom and the subsequent discovery of the disease in humans, her research was of international interest. After plaintiff reported the sexual harassment of Kohlickova, initiated her own complaint with the EEOC and filed this Complaint with the Court, plaintiff's sheep scrapie project was scrapped.[5] She was forced to abandon her sheep scrapie re-

sponsibilities and was left to delve into a new area of scientific research. Thus, *Jacob–Mua* is not controlling.

*Jacob–Mua* is distinguishable on the issue of pretext, as well. The *Jacob–Mua* court noted that "[t]he uncontroverted evidence in the record show[ed] ... that [Klopfenstein's] position was marked for elimination in the ordinary course of business ...," and that "the record ... fail[ed] to show the [defendant's] proffered reasons for transferring Klopfenstein to Idaho were pretextual." *Id.* As the Court next explains, the same cannot be said in the case at bar.

■ The Court finds that, viewing the facts in a light most favorable to the nonmoving party, plaintiff has established a prima facie case of retaliation. The question remaining is whether plaintiff has offered evidence to rebut defendants' legitimate, non-retaliatory reasons for its actions. Defendants contend that the restrictions on Schmerr's travel, the forced blind validation tests, and the eventual cancellation of plaintiff's project were due to budget restraints and the project's failure to produce viable results. According to plaintiff, the evidence will show that her project was progressing at a typical rate for a test of its complexity, and the complications she was experiencing at the time the blind validation tests were first imposed were also being experienced by scientists in other labs attempting to utilize the same technology. Plaintiff's Appendix at 12 (Schmerr Affidavit), and 39 (Goodwin Affidavit). Moreover, plaintiff maintains that her study did produce viable results, and that scientists in other labs have successfully utilized her sheep scrapie detection tech-

---

**5.** This chronology of events would permit the jury to infer that defendants took action in response to the protected activities in which plaintiff engaged. *See Sherman v. Runyon,* 235 F.3d 406, 410 (8th Cir.2000). Thus, for purposes of surviving the present summary judgment motion, plaintiff has satisfied the third element of her prima facie case.

nology. *Id.* at 62–63 (Chapman Affidavit); and 71 (Jackman Affidavit).

Plaintiff argues that Murray's forced blind validation tests are themselves proof of pretext. She claims that the blind validation tests were not intended to accurately assess the viability of plaintiff's technology. The tests were forced at a time when there were known technical difficulties with the component and instrumentation; contaminated blood samples were provided for testing; plaintiff was not allowed input into the testing process; and the methodology utilized was defective. Furthermore, defendants refused to provide plaintiff with the code to the second set of blind validation test, which would have allowed plaintiff to independently evaluate the viability of the sheep scrapie detection process she had developed. According to plaintiff, withholding a validation code is unheard of in the profession. Scientists, Roy Jackman and Kathryn Goodman, will testify that, because of the shoddy science employed, the blind validation tests could not have been done for the legitimate purpose of evaluating the viability of plaintiff's technology.

Viewing the evidence in a light most favorable to the nonmovant, the Court finds that there is sufficient evidence to allow the jury to determine whether defendants' proffered reasons for terminating plaintiff's project were pretextual. Therefore, the Court denies defendants' motion for summary judgment on plaintiff's retaliation claim.

## III. CONCLUSION

Plaintiff has failed to present facts establishing that sexual harassment has affected a term, condition or privilege of her employment. Therefore, defendants' motion for summary judgment is granted on plaintiff's hostile work environment claim. Because plaintiff has made a prima facie case of retaliation under Title VII, defendants' motion for summary judgment on that claim is denied.

IT IS SO ORDERED.