# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-3544/02-1411

_____

Diana Duncan,                  *

                       *

        Appellee,     *

                       *     Appeal from the United States

   v.                 *     District Court for the

                       *     Eastern District of Missouri.

General Motors Corporation,   *

                       *

        Appellant.    *

_____

Submitted: January 17, 2002
Filed: August 22, 2002

_____

Before WOLLMAN,[1] Chief Judge, RICHARD S. ARNOLD and HANSEN, Circuit
    Judges.

_____

HANSEN, Circuit Judge.

The Junior College District of St. Louis (the College) arranged for Diana
Duncan to provide in-house technical training at General Motors Corporation's
(GMC) manufacturing facility in Wentzville, Missouri. Throughout her tenure at
GMC, Duncan was subjected to unwelcome attention by a GMC employee, James

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on January 31,
2002. He has been succeeded by the author of this opinion.

Booth, which culminated in Duncan's resignation. Duncan subsequently filed this suit under Title VII of the Civil Rights Act and the Missouri Human Rights Act, see 42 U.S.C. §§ 2000e-2000e-17; Mo. Rev. Stat. §§ 213.010-213.137,[2] alleging that she was sexually harassed and constructively discharged. A jury found in favor of Duncan and awarded her $4600 in back pay, $700,000 in emotional distress damages on her sexual harassment claim, and $300,000 in emotional distress damages on her constructive discharge claim. GMC appeals from the district court's denial of its posttrial motion for judgment as a matter of law, and the district court's award of attorneys' fees attendant to the posttrial motion. We reverse.

I.

Diana Duncan worked as a technical training clerk in the high-tech area at GMC as part of the College's Center for Business, Industry, and Labor program from August 1994 until May 1997. Duncan provided in-house training support to GMC employees.

Duncan first learned about the College's position at GMC from Booth, a United Auto Workers Union technology training coordinator for GMC. Booth frequented the country club where Duncan worked as a waitress and a bartender. Booth asked Duncan if she knew anyone who had computer and typing skills and who might be interested in a position at GMC. Duncan expressed interest in the job. Booth brought the preemployment forms to Duncan at the country club, and he forwarded her completed forms to Jerry Reese, the manager of operations, manufacturing, and training for the College. Reese arranged to interview Duncan at GMC. Reese, Booth, and Ed Ish, who was Booth's management counterpart in the high-tech area of the

---

[2]We analyze Duncan's claims under Title VII and the Missouri Human Rights Acts using the same legal principles. See Gipson v. KAS Snacktime Co., 171 F.3d 574, 578 (8th Cir. 1999); Swyers v. Thermal Science, Inc., 887 S.W.2d 655, 656 (Mo. Ct. App. 1994).

GMC plant, participated in the interview. Duncan began work at GMC in August 1994.

Two weeks after Duncan began working at GMC, Booth requested an off-site meeting with her at a local restaurant. Booth explained to Duncan that he was in love with a married coworker and that his own marriage was troubled. Booth then propositioned Duncan by asking her if she would have a relationship with him. Duncan rebuffed his advance and left the restaurant. The next day Duncan mentioned the incident to the paint department supervisor Joe Rolen, who had no authority over Booth. Duncan did not report Booth's conduct to either Reese (her supervisor) at the College or Ish (Booth's management counterpart) at GMC. However, she did confront Booth, and he apologized for his behavior. He made no further such "propositions." Duncan stated that Booth's manner toward her after she declined his advance became hostile, and he became more critical of her work. For example, whenever she made a typographical error, he told her that she was incompetent and that he should hire a "Kelly Services" person to replace her. Duncan admitted that Booth's criticisms were often directed at other employees as well, including male coworkers.

Duncan testified to numerous incidents of Booth's inappropriate behavior. Booth directed Duncan to create a training document for him on his computer because it was the only computer with the necessary software. The screen saver that Booth had selected to use on his computer was a picture of a naked woman. Duncan testified to four or five occasions when Booth would unnecessarily touch her hand when she handed him the telephone. In addition, Booth had a planter in his office that was shaped like a slouched man wearing a sombrero. The planter had a hole in the front of the man's pants that allowed for a cactus to protrude. The planter was in plain view to anyone entering Booth's office. Booth also kept a child's pacifier that was shaped like a penis in his office that he occasionally showed to his coworkers and specifically to Duncan on two occasions.

In 1995, Duncan requested a pay increase and told Booth that she would like to be considered for an illustrator's position. Booth said that she would have to prove her artistic ability by drawing his planter. Duncan objected, particularly because previous applicants for the position were required to draw automotive parts and not his planter. Ultimately, Duncan learned that she was not qualified for the position because she did not possess a college degree.

Additionally in 1995, Booth and a College employee created a "recruitment" poster that was posted on a bulletin board in the high-tech area. The poster portrayed Duncan as the president and CEO of the Man Hater's Club of America. It listed the club's membership qualifications as: "Must always be in control of: (1) Checking, Savings, all loose change, etc.; (2) (Ugh) Sex; (3) Raising children our way!; (4) Men must always do household chores; (5) Consider T.V. Dinners a gourmet meal." (Appellant's App. at 99.) In April 1996, Booth and a College employee arranged to have Duncan "arrested" at GMC as part of a charity event. A fellow employee explained the event to Duncan, and Duncan left willingly with the "police officer." Booth's financial donation to the charity secured Duncan's "release." Instead of escorting Duncan back to GMC, and despite her protestations, Booth took Duncan to a bar.

On May 5, 1997, Booth asked Duncan to type a draft of the beliefs of the "He-Men Women Hater's Club." The beliefs included the following:

- Constitutional Amendment, the 19th, giving women [the] right to vote should be repealed. Real He-Men indulge in a lifestyle of cursing, using tools, handling guns, driving trucks, hunting and of course, drinking beer.
- Women really do have coodies [sic] and they can spread.
- Women [are] the cause of 99.9 per cent of stress in men.
- Sperm has a right to live.
- All great chiefs of the world are men.
- Prostitution should be legalized.

4

(Appellant's App. at 95-96.) Duncan refused to type the beliefs and resigned two days later.

Duncan testified that she complained to anyone who would listen to her about Booth's behavior, beginning with paint department supervisor Joe Rolen after Booth propositioned her in 1994. Duncan testified that between 1994 and 1997 she complained several times to Reese at the College about Booth's behavior, which would improve at least in the short term after she spoke with Reese. During that same time period, Duncan met twice with an attorney to discuss her treatment by Booth. Duncan reported Booth's alleged harassment to union official Bob Boatwright some time before April 1, 1997, and to the United Auto Workers local chairman employed at GMC, Wayne Belue, approximately one week later. Belue advised Duncan to report her allegations directly to Tom Pilkington who was the personnel director at the GMC plant. Duncan met with Pilkington, Boatwright, and Belue on April 1, 1997. During that meeting, Duncan recounted Booth's antics and explained that she previously had never complained to GMC management about Booth. Pilkington told Duncan that she needed to meet with Al Moellenhoff, GMC's Equal Employment Opportunity (EEO) coordinator. After the meeting, Personnel Director Pilkington removed the planter from Booth's office and contacted Moellenhoff and requested that he begin an investigation. Pilkington also informed the College that Duncan reported being harassed at GMC. Duncan met with EEO Coordinator Moellenhoff and agreed to prepare a written statement recounting the alleged incidents with Booth. In the meantime, Moellenhoff prepared a list of suggested corrective actions for GMC to initiate. Duncan resigned prior to submitting her written allegations to GMC and prior to GMC's initiation of any of the suggested corrective actions.

Duncan filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC) on October 30, 1997. The EEOC issued Duncan a right to sue notice on April 17, 1998. Alleging sexual harassment and constructive

discharge, Duncan filed suit against the College and GMC under both Title VII of the Civil Rights Act and the Missouri Human Rights Act. Duncan settled with the College prior to trial. After the jury found in Duncan's favor on both counts against GMC, GMC filed a posttrial motion for judgment as a matter of law or, alternatively, for a new trial. The district court denied the motion. The district court also awarded Duncan attorneys' fees in conjunction with GMC's posttrial motion. GMC appeals.

II.

A. Hostile Work Environment

GMC argues that it was entitled to judgment as a matter of law on Duncan's hostile work environment claim because she failed to prove a prima facie case. We agree. We review the district court's denial of a motion for judgment as a matter of law de novo, using the same standard as the district court. Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040, 1044 (8th Cir. 2002). Judgment as a matter of law is proper "when all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." Blackmon v. Pinkerton Sec. & Investigative Servs., 182 F.3d 629, 635 (8th Cir. 1999) (internal quotations omitted).

Under Title VII, an "employer" is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Passing for the moment the thorny issue of whether GMC was actually Duncan's employer under the statute, we turn our attention to the merits of her claims. In order to succeed on a claim of hostile work environment sexual harassment, Duncan was required to prove "that she was a member of a protected group, that she was subjected to unwelcome sexual harassment, that the harassment was based on sex, and that the harassment affected

6

a term, condition, or privilege of her employment." Beard v. Flying J, Inc., 266 F.3d 792, 797-98 (8th Cir. 2001).

It is undisputed that Duncan satisfies the first two elements of her prima facie case: she is a member of a protected group and Booth's attention was unwelcome. We also conclude that the harassment was based on sex. An offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). The fundamental issue is whether members of one sex are subjected to unfavorable conditions of employment that the members of the opposite sex are not. Id. Although there is some evidence in the record that indicates some of Booth's behavior, and the resulting offensive and disagreeable atmosphere, was directed at both male and female employees, GMC points to ten incidents when Booth's behavior was directed at Duncan alone. GMC concedes that five of these ten incidents could arguably be based on sex: (1) Booth's proposition for a "relationship"; (2) Booth's touching of Duncan's hand; (3) Booth's request that Duncan sketch his planter; (4) the Man Hater's Club poster; and (5) Booth's request that Duncan type the He-Men Women Haters beliefs. "A plaintiff in this kind of case need not show . . . that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment." Beard, 266 F.3d at 798. We conclude that a jury could reasonably find that Duncan and her gender were the overriding themes of these incidents. The evidence is sufficient to support the jury finding that the harassment was based on sex.

We agree, however, with GMC's assertion that the alleged harassment was not so severe or pervasive as to alter a term, condition, or privilege of Duncan's employment. See Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999). To clear the high threshold of actionable harm, Duncan has to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted). "Conduct that is not

severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." Oncale, 523 U.S. at 81 (internal quotation omitted). Thus, the fourth part of a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive. Harris, 510 U.S. at 21-22. In determining whether the conduct is sufficiently severe or pervasive, we look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. However, Title VII is "not designed to purge the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995). These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted).

The evidence presented at trial illustrates that Duncan was upset and embarrassed by the posting of the derogatory poster and was disturbed by Booth's advances and his boorish behavior; but, as a matter of law, she has failed to show that these occurrences in the aggregate were so severe and extreme that a reasonable person would find that the terms or conditions of Duncan's employment had been altered. See Scusa, 181 F.3d at 967 (experiencing unpleasant conduct and rude comments does not equate to severe or pervasive harassment that altered conditions of employment). Numerous cases have rejected hostile work environment claims premised upon facts equally or more egregious than the conduct at issue here. See, e.g., Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 872, 874 (5th Cir.) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, repeated touching of plaintiff's arm, and attempts to look down the plaintiff's

dress, were insufficient to support hostile work environment claim), cert. denied, 528 U.S. 963 (1999); Adusumilli v. City of Chicago, 164 F.3d 353, 357, 361-62 (7th Cir. 1998) (holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions), cert. denied, 528 U.S. 988 (1999); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24, 826 (6th Cir.) (reversing jury verdict and holding behavior merely offensive and insufficient to support hostile environment claim when employee reached across plaintiff, stating "[n]othing I like more in the morning than sticky buns" while staring at her suggestively; suggested to plaintiff that parcel of land be named "Hootersville," "Titsville," or "Twin Peaks"; and asked "weren't you there Saturday night dancing on the tables?" while discussing property near a biker bar), cert. denied, 522 U.S. 865 (1997); Weiss v. Coca-Cola Bottling Co., 990 F.2d 333, 337 (7th Cir. 1993) (holding no sexual harassment when plaintiff's supervisor asked plaintiff for dates, asked about her personal life, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her twice at work and once in a bar).

Booth's actions were boorish, chauvinistic, and decidedly immature, but we cannot say they created an objectively hostile work environment permeated with sexual harassment. Construing the evidence in the light most favorable to Duncan, she presented evidence of four categories of harassing conduct based on her sex: a single request for a relationship, which was not repeated when she rebuffed it, four or five isolated incidents of Booth briefly touching her hand, a request to draw a planter, and teasing in the form of a poster and beliefs for an imaginary club. It is apparent that these incidents made Duncan uncomfortable, but they do not meet the standard necessary for actionable sexual harassment. It is worth noting that Duncan fails to even address this component of her prima facie case in her brief. We conclude as a matter of law that she did not show a sexually harassing hostile

9

environment sufficiently severe or pervasive so as to alter the conditions of her employment, a failure that dooms Duncan's hostile work environment claim. <u>See</u> <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986).

## B. Constructive Discharge

GMC also challenges the jury's finding that Duncan was constructively discharged. An employee is constructively discharged if an employer renders the employee's working conditions so intolerable that the employee is forced to quit. <u>See</u> <u>Henderson v. Simmons Foods, Inc.</u>, 217 F.3d 612, 617 (8th Cir. 2000). An employee's dissatisfaction with working conditions does not establish a constructive discharge. <u>See</u> <u>Tidwell v. Meyer's Bakeries, Inc.</u>, 93 F.3d 490, 496 (8th Cir. 1996). To be reasonable "an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." <u>Summit v. S-B Power Tool</u>, 121 F.3d 416, 421 (8th Cir. 1997) (internal quotations omitted), <u>cert. denied</u>, 523 U.S. 1004 (1998). To be liable, GMC must have intended to force Duncan to quit or at least have reasonably foreseen Duncan's resignation as a consequence of the working conditions at GMC. <u>See</u> <u>Phillips v. Taco Bell Corp.</u>, 156 F.3d 884, 890 (8th Cir. 1998). Duncan contends that she faced over two years of harassment by Booth, which ultimately forced her to resign in May 1997. When viewed in the light most favorable to her, Duncan's working conditions were certainly not ideal and in many instances the environment that Duncan endured at GMC was offensive and disrespectful; however, these conditions were not so intolerable as to cause a reasonable person to resign and cannot support the jury's findings to the contrary. "Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment." <u>Jones v. Fitzgerald</u>, 285 F.3d 705, 716 (8th Cir. 2002).

In addition, Duncan did not give GMC a reasonable opportunity to work out the problem with Booth prior to submitting her resignation. After the April 1 meeting with Pilkington, Boatwright, and Belue, Pilkington immediately removed the planter from Booth's office and requested that EEO Coordinator Moellenhoff begin an investigation. That April 1 meeting was the first time that Duncan had complained to GMC's management officials who had the responsibility to take action on her complaint. Moellenhoff asked Duncan to prepare a written summary of her allegations, she agreed to do so, but she never followed through and had not submitted any written allegations at the time of her resignation. Given that the "policies underlying Title VII will be best served . . . [when] unlawful discrimination is attacked within the context of existing employment relationships," we conclude that Duncan failed to provide GMC with a reasonable time to investigate her unwritten allegations and to implement significant changes to her workplace environment. See Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998) (internal quotations omitted); see also Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."). We also conclude that Duncan could have taken steps short of resignation to improve her working conditions, but she declined to do so: Duncan rejected the College's offer to transfer her to an alternative work location. See Jones, 285 F.3d at 716 (discussing alternatives to resignation of which plaintiff did not avail herself). Duncan's constructive discharge claim fails as a matter of law.

Because we hold that Duncan fails to set forth sufficient evidence to establish a prima facie case that she was subjected to either a hostile work environment or that she was constructively discharged, we assume, without deciding, for purposes of this appeal that Duncan was GMC's employee. In addition, because we conclude that Duncan's claims fail as a matter of law and judgment must be entered in favor of GMC, we need not address the other arguments advanced by GMC.

11

## III.

For the foregoing reasons, we reverse the district court's denial of judgment as a matter of law. Because GMC should have prevailed on its posttrial motion, the award of attorneys' fees is likewise vacated.

RICHARD S. ARNOLD, Circuit Judge, dissenting.

The Court concludes that the harassment suffered by Ms. Duncan was not so severe or pervasive as to alter a term, condition, or privilege of her employment, and that, therefore, GMC is entitled to judgment as a matter of law on her hostile-work-environment and constructive-discharge claims. I respectfully disagree.

Ms. Duncan was subjected to a long series of incidents of sexual harassment in her workplace, going far beyond "gender-related jokes and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation omitted). When the evidence is considered in the light most favorable to her, and she is given the benefit of all reasonable inferences, there is "substantial evidence to sustain the cause of action." Stockmen's Livestock Market, Inc. v. Norwest Bank of Sioux City, 135 F.3d 1236, 1240 (8th Cir. 1998) (citation omitted). In Ms. Duncan's case, a jury reached the conclusion that Mr. Booth's offensive behavior created a hostile work environment. I believe this determination was reasonable and supported by ample evidence.

Ms. Duncan was subjected to a sexual advance by her supervisor within days of beginning her job. This proposition occurred during work hours and was a direct request for a sexual relationship. The Court characterizes this incident as a "single request," ante at 9. This description minimizes the effect of the sexual advance on Ms. Duncan's working conditions. During the months immediately following this

12

incident, Mr. Booth became hostile to Ms. Duncan, increased his criticism of her work, and degraded her professional capabilities in front of her peers. Significantly, there is no suggestion that this hostile behavior occurred *before* Ms. Duncan refused his request for sex. From this evidence, a jury could easily draw the inference that Mr. Booth changed his attitude about Ms. Duncan's work because she rejected his sexual advance.

Further, this sexual overture was not an isolated incident. It was only the beginning of a string of degrading actions that Mr. Booth directed toward Ms. Duncan based on her sex. This inappropriate behavior took many forms, from physical touching to social humiliation to emotional intimidation. For example, Mr. Booth repeatedly touched Ms. Duncan inappropriately on her hand. He publicly singled her out before her colleagues as a "Man Hater" who "must always be in control of" sex. He required her to choose between drawing a vulgar planter displayed in his office or not being considered for a promotion, an unfair choice that would likely intimidate a reasonable person from seeking further career advancement.

The Court cites cases in which our sister Circuits have rejected hostile-work-environment claims premised upon facts that the Court determines to be "equally or more egregious" than the conduct at issue here. I do not agree that Ms. Duncan experienced less severe harassment than those plaintiffs. For example, in <u>Weiss v. Coca-Cola Bottling Co.</u>, 990 F.2d 333 (7th Cir. 1993), the plaintiff did not allege that her work duties or evaluations were different because of her sex. This is not the situation Ms. Duncan faced. She was given specific tasks of a sexually charged nature, such as typing up the minutes of the "He-Man Women Hater's Club." Performing this "function" was presented to her as a required duty of her job.

Also Ms. Duncan was subjected to allegations that she was professionally "incompetent because of her sex." <u>Shepherd v. Comptroller of Public Accounts</u>, 168 F.3d 871, 874-75 (5th Cir.), <u>cert. denied</u>, 528 U.S. 963 (1999) (relying on the lack of

-13-

such allegations in affirming grant of summary judgment for employer). She adduced evidence of this factor when she testified that after she rejected his sexual advance, Mr. Booth became more critical of her work. With the request for her to draw the planter for a promotion, Ms. Duncan also faced "conduct that would prevent her from succeeding in the workplace," a fact that Ms. Shepherd could not point to in her case. Additionally, Ms. Duncan was "propositioned" to sleep with her employer, id. at 872, a claim not made by Ms. Shepherd.

Finally, we note that in Ms. Duncan's case the harassing acts were directed specifically at her. The Court in Black v. Zaring Homes, 104 F.3d 822, 826 (6th Cir.), cert. denied, 522 U.S. 865 (1997), stated that the lack of specific comments to the plaintiff supported the conclusion that the defendant's conduct was not severe enough to create actionable harm. By contrast, in the present case, a jury could reasonably conclude that Ms. Duncan felt particularly humiliated and degraded by Mr. Booth's behavior because she alone was singled out for this harassment.

Our own Court's Title VII jurisprudence suggests that Ms. Duncan experienced enough offensive conduct to constitute sexual harassment. For example, in Breeding v. Arthur J. Gallagher and Co. we reversed a grant of summary judgment to an employer, stating that a supervisor who "fondled his genitals in front of" a female employee and "used lewd and sexually inappropriate language" could create an environment severe enough to be actionable under Title VII. 164 F.3d 1151, 1159 (8th Cir. 1999). In Rorie v. United Parcel Service, we concluded that a work environment in which "a supervisor [ ] pats a female employee on the back, brushes up against her, and tells her she smells good" could be found by a jury to be a hostile work environment. 151 F.3d 757, 762 (8th Cir. 1998). Is it clear that the women in these cases suffered harassment greater than Ms. Duncan? I think not.

We have acknowledged that "[t]here is no bright line between sexual harassment and merely unpleasant conduct, so a jury's decision must generally stand

unless there is trial error." Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1998). We have also ruled that "[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998). The Court admits that Ms. Duncan took subjective offense to Mr. Booth's behavior and characterizes Mr. Booth's behavior as "boorish, chauvinistic, and decidedly immature." Ante at 9. Thus, the Court appears to agree that Mr. Booth's behavior was "improper conduct." I believe the Court errs in deciding as a matter of law that the jury did not act reasonably in concluding that Ms. Duncan faced severe or pervasive harassment that created a hostile work environment.

Therefore, I dissent from the Court's conclusion that Ms. Duncan did not present sufficient evidence to survive judgment as a matter of law on her hostile-work-environment and constructive-discharge claims.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-