# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3057

_____

|  |  |  |
|---|---|---|
| Kathy Lynn Alagna, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Smithville R-II School District, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 14, 2003

Filed: April 3, 2003

_____

Before WOLLMAN and MURPHY, Circuit Judges, and GRITZNER,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

Kathy Alagna appeals from the district court's[2] adverse grant of summary judgment on her sexual harassment and constructive discharge claims against the Smithville R-II School District (the District), her former employer. We affirm.

___

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

I.

The District hired Alagna as a social studies teacher in 1993. In 1996, Alagna began working as a guidance counselor at the high school. The District had hired David Yates in 1977 as a science teacher. At all times relevant to this action, Yates was a tenured teacher at the high school. According to his affidavit, Yates, who is five feet nine inches tall, has weighed between 300 and 450 pounds since at least the year 1996. As part of Alagna's practicum for her master's degree in psychology, Alagna interviewed Yates in the spring of 1996. They discussed his feelings of personal failure, financial problems, and marital difficulties. During the summer of 1998, Yates called Alagna's home "probably" more than twenty times to discuss his depression, suicidal thoughts, and marital problems. Yates began some of these calls by asking in a low voice if Alagna was alone, whether she could talk, and whether the calls were causing problems between her and her husband. Alagna could not recall whether she ever asked Yates to stop calling her at home. At the beginning of the 1998-99 school year, Alagna reported the series of calls to Wayne Krueger, the high school principal. Alagna told Krueger that the calls annoyed her and that Yates had talked to her about suicide. She could not recall whether she asked Krueger to take any action with respect to Yates. Although Krueger did not speak to Yates about the phone calls, Yates did not call Alagna at home after the school year started.

During the fall 1998 semester, Yates visited Alagna in her office an average of two to three times per week. On one such visit, Yates stated "I purposely kept the door open because I don't want your reputation to be harmed. I don't want people to think things about us." Yates discussed his failed relationships with other women, his relationship with his wife, and other intimate details of his personal life. On several occasions Yates would end the conversation by moving close to Alagna, touching her arm, looking her up and down, and saying that he "loved" her and that she was "very special." Although Yates's classroom was on the first floor, he regularly waited outside Alagna's second-floor office and stared at her as she walked

-2-

by. He often told her, "You look very nice today, Ms. Alagna." According to Alagna's deposition testimony, Yates never discussed sexual activities related to his relationships, never sexually propositioned her, and never touched her in any area other than her arm.

During the 1998 Christmas break, Yates called Alagna at home three times to discuss his financial problems and his feelings of isolation from his family. He told Alagna that he received no support at home and that he was reliant on his students to give him self-worth. In January and early February of 1999, Yates continued to visit Alagna in her office to discuss his feelings of failure, depression, and inadequacy. On February 8, 1999, Yates placed two "romance novels" in Alagna's faculty mailbox at school. The novels were written in the 1870s by George MacDonald, a writer of Christian historical fiction. Immediately after Alagna removed the books from her mailbox and realized that they were from Yates, she put them back in Yates's mailbox. Although she could not recall the exact words, Alagna testified that Krueger had implied something sexual about the books.

On February 8, 1999, Alagna expressed her concern about Yates's behavior to Robert Leachman, the District's assistant superintendent and compliance coordinator for complaints of sexual harassment. On February 11, 1999, Alagna and another high school teacher met with Principal Krueger and complained about Yates's conduct. They related incidents involving other female faculty and students and asked Krueger to instruct Yates that he was to have no further contact with Alagna. Alagna memorialized this meeting in a memorandum to Krueger. Krueger met with Yates and orally reprimanded him about his conduct related in the complaints from female students and faculty. Krueger memorialized the meeting and reprimand in a memorandum to Yates dated February 11, 1999. On February 12, Yates told Alagna that Krueger had instructed him not to speak with females alone and not to continue talking to Alagna. Although Krueger gave Yates a sexual harassment pamphlet and

required his attendance at a previously scheduled sexual harassment seminar, he did not specifically direct Yates to stay away from Alagna.

Yates initially complied with Krueger's directions, but in April he resumed going to Alagna's office to discuss his personal dissatisfaction with life and his feelings of isolation. Alagna reported these visits to Krueger, who responded by asking Alagna if she could "imagine having sex with David Yates." Yates did not call Alagna during the summer of 1999. During the summer, Alagna applied for jobs with other school districts and received two job offers. One district offered Alagna a job as a high school counselor that would have paid her more than she made at the District. Alagna declined the offer, citing her role in helping another Smithville teacher write two grants, the nicer facilities at Smithville, and because "Smithville was the known. I knew what I had to do. I knew what the issues were and I knew what the problems were."

Alagna returned to the District for the new school year in August of 1999. Although Yates did not call Alagna at home or visit her office, he often stopped her in the hallway and asked her to talk. In addition to thanking Alagna for telling him about professional and personal boundaries, Yates continued to invade Alagna's personal space and make comments such as "I just want you to know how much I love you." Alagna perceived his eye contact, tone of voice, and demeanor to be of a "sexual nature." Alagna met with Krueger in November 1999 and asked him to remind Yates of his prior directives. Krueger typed a note to Yates, informing him that female faculty members believed he had "crossed the boundary" with them and reminding him that the February 1999 directives were still in place. Krueger also gave Yates a second copy of the sexual harassment policy. Despite another request, Krueger did not specifically direct Yates to stay away from Alagna. Alagna's fear led her to work with her door locked, stop eating in the cafeteria, avoid the hallways when possible, and carry pepper spray.

On January 4, 2000, Yates gave Alagna a wrapped gift and told her to open it when she was alone. Alagna met with Krueger later that day and told him about Yates's behavior. In a memorandum dated January 5, 2000, Alagna advised Krueger that she had spoken with an attorney and requested additional interventions regarding Yates. After Krueger and Alagna met on January 6, Krueger specifically directed Yates not to be alone with Alagna. Other than a verbal and written reprimand, no disciplinary action was taken against Yates. Shortly thereafter, Alagna took an extended leave of absence, from which she did not return.

On January 13, 2000, Assistant Superintendent Leachman wrote a letter to Alagna acknowledging his receipt of her January 5 memorandum and informing her that he was "taking all measures short of termination" to stop Yates's inappropriate behavior toward her. The letter went on to state that Yates was to contact Alagna only regarding student issues, and then only in the presence of an administrator, and that any violation of those directions could result in Yates's termination. The letter requested that Alagna contact Leachman to discuss the matter. Notwithstanding a January 25 follow-up letter reiterating this request, Alagna never contacted anyone at the school to discuss the disciplinary measures taken against Yates.

In February 2000, the District offered Alagna a position as a counselor at the middle school. Although the position carried the same salary and benefits, Alagna declined because she did not feel that she should have to be the one to leave the high school. On February 28, 2000, Yates submitted his resignation, effective the end of the school year. The District informed Alagna that Yates was retiring and that her position was still available for the next school year. Alagna resigned on May 23, 2000.

Alagna was not the only target of Yates's inappropriate behavior during the 1998-99 and 1999-2000 school years. Several female faculty and students reported that Yates told them they looked pretty, told them "I love you," and invaded their

personal space by, for example, rubbing against them as he walked between desks. Some female students requested and received assignments to different classrooms after incidents with Yates. These students complained that Yates had stood too close to them; he had asked one to stay after school so he could carve her face into a wooden block; and he had commented to one that the shirt she was wearing made her look "really good." Yates exhibited many of the same behaviors toward male employees. Yates phoned male employees at their homes, using similar introductory phrases, such as "Can you talk?" and "I hope this is not causing problems with your wife." Yates visited the offices or classrooms of male teachers to discuss his personal problems, gave them unsolicited gifts, invaded their personal space, and made comments to them such as, "I love you" and, "you are very special."

## II.

We review the district court's grant of summary judgment de novo. Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 964 (8th Cir. 1999). "Summary judgment is appropriate if the movant has shown that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law; in assessing the evidence we take the non-movant's evidence as true, drawing all reasonable inferences in his or her favor." Id. (citing Fed. R. Civ. P. 56(c); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 268-69 (8th Cir. 1993)). Alagna's claims arise under both Title VII and the Missouri Human Rights Act. We analyze Alagna's claims under the Missouri Human Rights Act, Mo. Rev. Stat. §§ 213.010 – .137, in the same manner as we analyze her Title VII claims. Duncan v. General Motors Corp., 300 F.3d 928, 930 n.2 (8th Cir. 2002).

> [T]o establish a claim of hostile work environment sexual harassment by non-supervisory co-workers, a plaintiff must establish that (a) she belongs to a protected group; (b) that she was subject to unwelcome sexual harassment; (c) that the harassment was based on sex; (d) that the harassment affected a term, condition, or privilege of employment; and

(e) that the employer knew or should have known of the harassment and failed to take proper remedial action.

Scusa, 181 F.3d at 965 (citing Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1222 (8th Cir. 1997); Kopp, 13 F.3d at 269). The district court determined that Alagna could not prove element "c", that the alleged harassment was based on sex, or element "d", that it affected a term, condition, or privilege of employment. We agree that Alagna failed to raise a genuine issue of fact regarding whether the harassment affected a term, condition, or privilege of employment. Accordingly, we express no opinion on whether the evidence suggesting that the allegedly harassing behavior was also directed toward male employees is sufficient to establish an "equal opportunity" harasser defense. See Kopp, 13 F.3d at 269 (requiring a Title VII plaintiff to prove that one sex was treated worse than the other); Holman v. Indiana, 211 F.3d 399, 403 (7th Cir. 2000) ("[B]ecause Title VII is premised on eliminating discrimination, inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit.").

Title VII does not authorize us to impose a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). To be actionable under Title VII, the alleged harassment must be so severe or pervasive as to affect a term, condition, or privilege of employment. Duncan, 300 F.3d at 934. "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787-88. We examine the totality of the circumstances, including the frequency and severity of the discriminatory conduct; "whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.; Duncan, 300 F.3d at 934. These standards are demanding – to be actionable, conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment. Faragher, 524 U.S. at 788; Duncan, 300 F.3d at 934.

Considered as a whole, Yates's conduct, however inappropriate, was not sufficiently severe or pervasive to satisfy the high threshold for actionable harm. Yates strikes us as being a troubled individual, insecure, depressed, and in need of constant reassurance of his worth as a human being. His "I love you" comments to Alagna, when considered in the light of his plaintive calls for reaffirmation of self-worth and the absence of any sexual advances on his part, are more indicative of one in search of friendship than of a sexual predator. His conduct was far less objectionable than that which we found insufficiently severe or pervasive to support the plaintiff's hostile environment claim in <u>Duncan</u>. There, we agreed that the harasser's behavior was "boorish, chauvinistic, and decidedly immature," but nonetheless concluded as a matter of law that it did not create an objectively hostile work environment. 300 F.3d at 935.

The cases on which Alagna relies involved conduct far more severe than the conduct directed at her. <u>See</u> <u>Breeding v. Arthur J. Gallagher and Co.</u>, 164 F.3d 1151, 1159 (8th Cir. 1999) (finding a supervisor's fondling of his genitals in front of the victim and his use of lewd and sexual language sufficiently offensive to alter the victim's working conditions); <u>Howard v. Burns Bros., Inc.</u>, 149 F.3d 835, 838 (8th Cir. 1998) (citing repeated sexual innuendos, intentional brushing up against the victim's buttocks, lewd jokes punctuated by gestures including touching breasts and thrusting hips); <u>Bales v. Wal-Mart Stores, Inc.</u>, 143 F.3d 1103, 1107, 1109 (8th Cir. 1998) (characterizing as "offensive, oftentimes overtly sexual or personal" evidence including the harasser's reference to a marker as a "big red penis," a sexually suggestive birthday card, and a conversation with the victim about the harasser's dream of her wearing a sexy red dress). Although harassing behavior need not be sexual in nature to make out a Title VII claim, <u>Smith v. St. Louis Univ.</u>, 109 F.3d 1265, 1269 (8th Cir. 1997), Yates's conduct toward Alagna does not satisfy the threshold of proof required by our cases.

For the same reasons that we conclude Alagna's work environment was not objectively hostile, it follows that her work environment was not so intolerable as to compel a reasonable person to resign.  See <u>Breeding</u>, 164 F.3d at 1160.  Thus, her constructive discharge claim must also fail.

The judgment is affirmed.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.