**Stacey FORD, Plaintiff**

v.

**COLSON CASTER CORPORATION, Defendant.**

**No. 3:03CV00106 JLH.**

United States District Court,
E.D. Arkansas,
Jonesboro Division.

Jan. 21, 2005.

---

Scott A. Emerson, Lyons, Emerson & Cone, PLC, Jonesboro, AR, for Plaintiff.

Richard A. Lusby, Mark Alan Mayfield, Womack, Landis, Phelps, Mcneill & Mcdaniel Century Center, Jonesboro, AR, Sally J. Scott, Ronald J. Hein, Jr., Jeff Nowak, Franczek Sullivan, P.C., Chicago, IL, for Defendant.

## OPINION AND ORDER

HOLMES, District Judge.

Stacey Ford brought this Title VII action against Colson Caster Corporation alleging discrimination based on sex in violation of 42 U.S.C. § 2000e–2. Colson has moved for summary judgment (Docket # 23).

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir.2003). When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985) (quoting Fed.R.Civ.P. 56(c)). The non-moving party sustains this burden by showing that "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. In deciding a motion for summary judgment, the Court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir.2001). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir.1996).

### I.

Ford worked for Colson on two separate occasions. From 1996 through 1999, she worked as an intern conducting market research and as a part-time marketing coordinator. In March 2002, Ford returned to Colson as a marketing research assistant working part-time three to four days per week with a maximum of thirty hours. According to Ford, she was hired by Bill Blackley, the National Sales and Marketing Manager and Vice–President of Colson.

While employed with Colson, Ford received most of her work assignments from Blackley. Blackley insisted that Ford travel to all trade shows and sales meetings with him. Ford has testified that Blackley made unwelcome sexual advances toward her. Ford's complaints are described in more detail later in this opinion. Eventually, Blackley suggested that Ford work full-time for Colson in a new position to be created. In June or July 2002, Blackley instructed Jim Hillyer, Colson's Special Projects Manager in Sales and Marketing, to create a job description for a Marketing Research/Product Development Position. Blackley and Hillyer reviewed the job description with Ford. Blackley proposed that the position pay $45,000 a

year and that the target start date would be September 1, 2002. After the three of them agreed on the description, Blackley told Ford that Jim Blankenship, President of the company, would have to look at it and approve the new position.

On August 11, 2002, Jim Martin, an employee of an affiliated company with office space at Colson, told Sandra Arwood, Colson's Human Resources Supervisor, that Ford was being subjected by Blackley to some situations that had made her uncomfortable and that she had been promised a full-time job at Colson.

The next day, Ford was asked to go to the human resources office to meet with Darrell Pickney, Human Resources Manager, and Arwood. Prior to this meeting, Ford had not informed anyone in the human resources department that she was being subjected to harassment by her supervisor. At the meeting, Pickney informed Ford that a person whom he did not name had filed a sexual harassment claim on her behalf. Pickney inquired as to whether Ford was having problems with Blackley. Ford stated that she had things under control or "the situation can be handled." However, she refused to sign a statement saying that Blackley had not harassed her, so Pickney insisted that Ford tell the truth about what had happened with Blackley. Ford told Pickney and Arwood about Blackley's conduct on a recent Detroit business trip. She claimed that Blackley: "got mad" because she would not pretend to be his wife; remarked that she should not forget who "was the one that got [her] the job [and that she] should not forget who just got [her] a raise and a promotion;" and asked her to have an affair with him. She also told Pickney that Blackley repeatedly asked her to have an affair with him; told

her that she was 33 years old, had three kids, and that she should take him up on his offer to have an affair with him; and told her not to forget who got her the promotion.

According to Arwood's notes of the meeting and a subsequent phone call, Ford complained that Blackley:

- suggested they share a room on the Detroit business trip;

- told her she was 32, had 3 kids and wasn't getting any younger so they should have an affair;

- at a dinner during a Dallas business trip told several co-workers that he loved her;

- came to her hotel room in Dallas and repeatedly knocked on her door;

- after a trip to Florida, told her that he could not stop thinking about her and they should have an affair; [1]

- used a co-worker's phone to call her from out of the office and tell her he loved her; and

- touched her leg when she was in his office working on his computer.

At the end of the meeting, Ford inquired as to how this incident would affect her new position. Pickney told Ford that even though Blackley had proposed a full-time position be created for her, such a position did not exist at the time. Pickney told Ford that if a full-time position became available, he would keep her in mind. Pickney also told Ford that Colson would conduct an investigation into Blackley's conduct, that she should go home until the investigation was concluded, and that Colson would pay her for the remainder of the week.

---

1. The business trip to Florida occurred on April 3 and 4, 2002; the business trip to Dallas occurred from June 17 through 21, 2002. The business trip to Detroit occurred on July 23 and 24, 2002.

Pickney interviewed a number of Colson employees about Ford's allegations. From the investigation, Pickney determined that Blackley had engaged in improper conduct with Ford and unprofessional conduct with other sales and marketing department employees. At the conclusion of the investigation, Blankenship and Pickney met with Blackley and told him that he could resign or that he would be fired. Pickney prepared a statement of reasons as to why Blackley must resign or be fired. That document states:

Reasons for Requesting Resignation:

1.) Improper conduct with female subordinate.

 A. Asked female associate to share a room during Michigan trip.

 B. Scheduled female associate on trips unnecessarily.

 C. Stated in front of co-workers that you loved her.

 D. Made promises of salary and full-time work status that you had no authority to make.

 (Associate also alleges that you have repeatedly asked her to have a sexual affair with you; was told that she should tell people she was your wife in certain situations; that you had treated her coldly since she refused your advances; and have touched her inappropriately on her leg.)

2.) Unprofessional interaction with D.M.'s and other subordinates.

 A. Have challenged your subordinate to engage in physical confrontations with you.

 B. Conducted company business with subordinates in bars which made them uncomfortable.

 C. Excessive drinking with and around subordinates.

 D. Asked subordinates to cover excessive bar tabs on their expense reports.

The foregoing statement of reasons was used by Blankenship and Pickney in their meeting with Blackley. At the end of the meeting, Blackley resigned.

On August 16, 2002, Pickney called Ford and told her that Blackley had been let go and that she could return to work the next Monday. In a letter dated August 19, 2002, Pickney informed Ford that she should notify him if she believed she was being subjected to retaliation for her participation in the investigation. She never did so.

Ford alleges that Colson's employees began turning a cold shoulder to her after Blackley's resignation. Employees would not talk about the investigation for fear of being fired. Four of Colson's employees were called into Pickney's office for discussing the investigation with Ford. After the investigation and Blackley's resignation, Ford says that she was no longer invited to meetings that she had previously attended, including the sexual harassment training. Pickney testified that Ford was absent from work the day he conducted the sexual harassment training and that he asked Hillyer to review the company's policy with Ford when she returned. Ford felt that her job duties slowly decreased after Blackley resigned.

In mid-September 2002, Colson offered Ford an opportunity to work as a customer service representative, which was a full-time position with benefits. According to Ford, the position would have required her to work more hours, but she would have been compensated at a lower rate than the compensation for her part-time position. As a result of having to work more days and longer hours, Ford calculated that the cost of daycare would outweigh the increased wages of the customer service position. Ford declined the offer.

In November 2002, three months after Blackley's resignation, Colson informed Ford that the corporation was downsizing and that her position would be eliminated. After filing an EEOC complaint and receiving a right-to-sue letter, Ford filed the present action in federal court, alleging *quid pro quo* sexual harassment, hostile work environment, discriminatory retaliation, and breach of contract.

## II.

 Ford first argues that she was subjected to *quid pro quo* harassment. "To make a prima facie case of quid pro quo harassment, [Ford] must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment." *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir.1995). Sexual harassment is *quid pro quo* if a tangible employment action follows an employee's refusals to submit to a supervisor's sexual demands. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). *See also Faragher v. City of Boca Raton,* 524 U.S. 775, 808, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 728 (8th Cir.2000).

Ford testified at her deposition that she continually denied Blackley's advances.

After returning from their last business trip, Blackley began giving Ford the "silent treatment." He also refused to allow her to participate in marketing meetings and told her that the start-up date for her new position, which never had been approved by the company president, had been pushed back to late December. Ford believed that this was all a result of her denying his sexual advances. However, only the decision not to create the full-time job that Blackley had promised and the November decision to terminate her employment can properly be considered "tangible employment actions." Blackley made neither decision. No reasonable jury could conclude that either decision was made because Ford refused Blackley's advances. Ford has presented no evidence that she suffered a tangible employment action at the hands of her harassing supervisor—a requirement to establish *quid pro quo* harassment. *Johnson v. West,* 218 F.3d 725, 731 (7th Cir.2000). Thus, her *quid pro quo* sexual harassment claim fails as a matter of law.

 Even though Ford has presented no evidence that she suffered a tangible employment action by a harassing supervisor, she might still prevail by showing that the misconduct created a hostile work environment in violation of Title VII. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1006–07 (8th Cir.2000). To establish a hostile work environment, Ford must demonstrate that: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of employment. *Duncan v. General Motors Corp.,* 300 F.3d 928, 933 (8th Cir.2002).[2] To be

**2.** If Ford had alleged that the harassment was

committed by a co-worker, Ford would need

actionable under Title VII, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275. When determining whether the environment is hostile or abusive, the Court must consider "the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 788–89, 118 S.Ct. 2275. The Court must evaluate the totality of the circumstances in judging hostility; only extreme conduct will amount to discriminatory changes in the terms and conditions of employment. *Id.* at 787–88, 118 S.Ct. 2275. A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents." *Eich v. Board of Regents for Cent. Missouri State University*, 350 F.3d 752, 759 (8th Cir.2003).

 Ford is a member of a protected class; she was subjected to unwelcome advances by Blackley; and the harassment was based on her sex. The issue is whether the harassment was so severe or pervasive as to alter a term, condition, or privilege of Ford's employment. *Duncan*, 300 F.3d at 933–34. To clear that high threshold, Ford would have to show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Ford must present evidence from which a reasonable jury could find that Blackley's

conduct towards her was more than merely offensive, rude, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment. *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir.2003) (finding to be inappropriate but not actionable conduct that involved frequent calls to plaintiff's home, regular visits to her office, the bestowing of gifts, the touching of plaintiff's arm, and the frequent expressions of "I love you"). The conduct must be extreme before it can be said to have, in an objective sense, affected the terms and conditions of employment. *Id.* at 980; *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 530 (8th Cir.1999) (holding that any sexual harassment conduct must be severe or pervasive to be actionable). Simple teasing, offhand comments, and isolated incidents generally do not amount to severe or pervasive harassment. *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Duncan*, 300 F.3d at 934. The behavior creating the hostile working environment need not be overtly sexual in nature, but it must be unwelcome in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive. *Jones v. Clinton*, 974 F.Supp. 712, 723 (E.D.Ark. 1997).

Viewing the facts of this case in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, the Court cannot say that the sexual harass-

---

to establish a fifth element—that Colson "knew or should have known of the conduct and failed to take proper remedial action." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 987 (8th Cir.1999); *Carter v. Chrysler*

*Corp.*, 173 F.3d 693, 700 (8th Cir.1999). This element is not implicated here because the alleged harassment was committed by Ford's supervisor. *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir.2004).

ment was insufficiently severe or pervasive to establish a *prima facie* case that she was subjected to a hostile work environment. On the facts presented here, the question of whether the harassment created a hostile environment is a fact question best left to the jury. *Moring v. Ark. Dept. of Correction,* 243 F.3d 452, 456 (8th Cir. 2001); *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 888 (8th Cir.1998); *Rorie v. United Parcel Serv.,* 151 F.3d 757, 762 (8th Cir.1998).

■ Even so, Colson argues that it is still entitled to summary judgment because of the affirmative defense established in *Ellerth* and *Faragher.* The *Ellerth/Faragher* defense protects an employer from liability if (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth,* 524 U.S. at 764–65, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275.

The only evidence to which Ford points to avoid summary judgment on the *Ellerth/Faragher* defense is her own testimony that she never saw Colson's harassment policy posted on the company bulletin board and was unaware that the policy existed. She contends that the testimony of other Colson employees who saw the policy on the bulletin board is not credible because those employees could not say where on the bulletin board it was located. Neither party cites a case holding whether these circumstances create a genuine issue of material fact as to the *Ellerth/Faragher* defense. Ford testified that she knew that she could take complaints to the human resources department, but she admits that she never did so. The undisputed fact that Ford knew she could take complaints to the human resources department but

never did so is sufficient to establish the second prong of the *Ellerth/Faragher* defense—that Ford "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. *See also Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Moreover, the employer here did exactly what an employer is supposed to do. The employer created a reasonable policy governing sexual harassment and, upon learning of sexual harassment, promptly investigated and forced the harasser to resign. It is undisputed that Ford was subjected to no further sexual harassment after Colson's human resource department first learned of Blackley's wrongful behavior. Hence, the undisputed facts establish the first prong, as well as the second prong, of the *Ellerth/Faragher* defense.

As to the *Ellerth/Faragher* defense, the present case is controlled by *McCurdy v. Arkansas State Police,* 375 F.3d 762 (8th Cir.2004), and *Jackson v. Ark. Dept. of Educ., Voc. and Tec. Educ. Div.,* 272 F.3d 1020 (8th Cir.2001). In both of those cases, the Eighth Circuit affirmed summary judgment for the defendant based on the *Ellerth/Faragher* affirmative defense. Here, as in *McCurdy* and *Jackson,* upon learning of the harassment, the employer promptly investigated and took effective steps to prevent future harassment. Imposing liability here would be to impose strict liability on the employer, which the Supreme Court and the Eighth Circuit have said is impermissible in sexual harassment cases. *Faragher,* 524 U.S. at 792, 118 S.Ct. 2275; *McCurdy,* 375 F.3d at 771.

■ Ford next contends that she suffered retaliation as a result of her complaints of harassment. To establish a case of retaliation, Ford must show: (1) that

she engaged in a protected activity, complained about sexual harassment, (2) that Colson took adverse action against her, and (3) that there is a causal connection between those two. *Baker v. John Morrell & Co.*, 382 F.3d 816, 829 (8th Cir.2004). If Ford were to establish a prima facie case of retaliation, Colson would then have the opportunity to rebut Ford's case by advancing a legitimate, non-retaliatory reason for the adverse employment action. *Ruby v. Springfield R–12 Pub. Sch. Dist.*, 76 F.3d 909, 911 (8th Cir.1996). If Colson were to make this showing, Ford would have to show that Colson's proffered reason was a pretext for illegal retaliation. *Montandon v. Farmland Industries, Inc.*, 116 F.3d 355, 359 (8th Cir.1997).

There is no evidence that Ford's termination was caused by her complaint against Blackley. It is undisputed that Colson offered her a full-time position in September after Blackley had resigned, but she decided not to accept that position because it would have required her to spend additional money on daycare for her children. It is undisputed that Blackley's replacement directed the human resources department to discontinue the part-time marketing research position. There is no evidence that Blackley's replacement knew of the situation involving Blackley and Colson. Colson has submitted evidence of nondiscriminatory reasons to support its decision to terminate Ford's part-time position. Colson downsized in late 2002 and early 2003 due to a decline in sales. Pickney's affidavit is undisputed that between November 2002 and February 2003 Colson was forced to eliminate a number of positions. It is undisputed that Ford was the only part-time office employee employed at Colson's Jonesboro facility. It is undisputed that Ford's part-time position was eliminated, and her duties were absorbed by co-workers; she was not replaced. There is unrebutted evidence that the decision to discharge Ford was caused by Colson's

decision to downsize due to loss of sales; and there is no evidence that Ford's discharge was caused by her complaint against Blackley. Ford has failed to show that a genuine issue of material fact exists as to her claim of retaliatory discharge.

Ford argues next that a genuine material issue of fact exists as to whether Colson breached an employment contract formed when Blackley provided her a full-time position that would have paid approximately $45,000 and would have begun on September 1, 2002. According to Ford, Colson was obligated to honor this promise because Blackley was acting as Colson's agent. In contrast, Colson argues that Blackley had no authority to create a new full-time position, and that the person with that authority, Jim Blankenship, never approved the new position, so no contract was formed for Ford to become a full-time employee.

If the Court were to find that Ford and Colson entered into a contract for full-time employment, that contract would be governed by the employment-at-will doctrine. Under Arkansas law, when the term of employment in a contract is left to the discretion of either party, or left indefinite, or terminable by either party, either party may put an end to the relationship at will and without cause. *City of Green Forest v. Morse*, 316 Ark. 540, 546, 873 S.W.2d 155, 158 (1994). Ford does not argue that the contract for full-time employment was for a definite term. Hence, even if Colson and Ford entered into an employment contract for a full-time position to begin on September 1, 2002, either party could have terminated the contract at will. Ford argues that Arkansas would recognize a public policy exception for cases in which an employee was discharged for reporting sexual harassment. *Cf. Island v. Buena Vista Resort*, 352 Ark. 548, 563, 103 S.W.3d 671, 679 (2003); *Lu-*

*cas v. Brown,* 736 F.2d 1202, 1205 (8th Cir.1984). Factually, Ford's argument on this point is essentially a repetition of her retaliatory discharge claim. As noted above, no reasonable jury could find that Ford was discharged in retaliation for reporting Blackley's harassment. Likewise, no reasonable jury could find that Colson declined to fulfill Blackley's unauthorized promise of full-time, $45,000 per year employment because of Ford's participation in the sexual harassment investigation. Therefore, there is no genuine issue of material fact on Ford's claim that her discharge violated the public policy of Arkansas. Under Arkansas law, Colson could terminate the employment contract at will. Accordingly, Colson is entitled to judgment as a matter of law on Ford's breach of contract claim.

### III.

The defendant's motion for summary judgment (Docket # 23) is GRANTED because Ford has not come forward with specific facts showing that there is a genuine issue for trial regarding her hostile work environment, *quid pro quo* sexual harassment claim, retaliatory discharge, or breach of contract claim.