# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-1018

_____

| | | |
|---|---|---|
| Keri Henthorn, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Capitol Communications, Inc., doing | * | |
| business as WOI-TV Channel 5; | * | |
| Jim Parker, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: December 15, 2003

Filed: March 5, 2004

_____

Before WOLLMAN, JOHN R. GIBSON, and RILEY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Keri Henthorn appeals the district court's[1] grant of summary judgment in favor of Capitol Communications, Inc. and Jim Parker on her sexual harassment claims brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

_____

[1]The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

2000e et seq., and the Iowa Civil Rights Act, Iowa Code §§ 216.6 and 216.11.[2] Having reviewed the district court's grant of summary judgment de novo, Evergreen Invs., LLC v. FCL Graphics, Inc., 334 F.3d 750, 753 (8th Cir. 2003), we affirm.

## I.

Henthorn, who was then employed as a news anchor at a television station in Scottsbluff, Nebraska, was interviewed by Jim Parker in July 1999 for the position of photojournalist with Capitol Communications, Inc., WOI-TV Channel 5 (WOI) in Des Moines, Iowa. At the time, Parker was station manager of WOI. Henthorn testified in her deposition that Parker told her during the interview that she "would be given a chance to anchor or fill in for someone . . . who was out" during the first opportunity that became available. Henthorn accepted Parker's offer of a position "as a one-man band photojournalist." Accordingly, she resigned her position in Scottsbluff and began working at WOI in September 1999.

Henthorn testified that during her first few weeks of work Parker asked her out every day. She alleged that Parker made comments to other employees outside of her presence that she was "hot." Although Henthorn told Parker that she was not interested in a relationship, he continued to ask her out, often suggesting that they talk about things "over a drink." Some of the after-work events he invited her to were group outings with other employees, several of which she attended. Following one of these group outings, Parker left a message on Henthorn's answering machine, the content of which Henthorn found difficult to understand because it sounded to her as though Parker had had a lot to drink. A week or two after the first call, Parker again

---

[2]Henthorn states a claim against Parker only under the Iowa statute. We analyze both the Title VII and the Iowa Civil Rights Act claims by applying the analytical framework established by the federal courts for Title VII cases. Pecenka v. Fareway Stores, Inc., 672 N.W.2d 800, 803 (Iowa 2003); Hulme v. Barrett, 449 N.W.2d 629, 631 (Iowa 1989).

called Henthorn at her home late at night (12:30 or 1:00 a.m., to the best of her recollection), again leaving a message on her answering machine, this one including an invitation to attend a concert by Billy Joel, a popular entertainer, an invitation that Henthorn declined.

The record reveals that during Henthorn's first several months of work at WOI, Parker wrote two memos to her at the direction of WOI's General Manager, Ray Cole. The first memo, in October 1999, was written after Cole and Parker discussed the quality of Henthorn's work and Cole told Parker that he needed to do something to improve her performance. Parker used the memo to outline ways in which Henthorn needed to improve. Parker suggested at various times that he and Henthorn discuss the memo over a drink, and at one point indicated that he would rip the memo up if Henthorn would have a drink with him. Henthorn refused this invitation as well, but Parker nevertheless destroyed the memo, saying that Henthorn had been working hard and had improved. In December, Cole told Parker he was still displeased with Henthorn's work and verbally directed him to write a second memo. Henthorn received the second memo in December 1999, two weeks after she declined Parker's invitation to attend the Billy Joel concert. Believing that the second memo was based on her refusals of Parker's advances, Henthorn lodged a sexual harassment complaint on December 17, 1999, in accordance with the procedure specified in WOI's employee handbook. She later spoke to Cole, who immediately initiated an investigation of Henthorn's claims. After preliminary investigation by another employee, Cole continued to investigate the matter himself. After interviewing several employees, he concluded that there was likely some merit to Henthorn's complaints, reprimanded Parker, suspended him for three days, and established a separate supervisor for Henthorn so that she would have as little direct interaction with Parker as possible. Upon completing his investigation, Cole told Henthorn that she should immediately report to him directly any further problems related to Parker.

Notwithstanding the reprimand and temporary suspension, Parker continued in his position as station manager. Although Parker no longer asked Henthorn out or reprimanded her, Henthorn believed that he directed various negative changes in her schedule and assignments. Likewise, although Parker frequently yelled at all employees, Henthorn felt that he singled her out for more criticism than others received, including yelling at her in front of others. She complained to her then supervisor, Sonya Heithsusen, but she did not approach Cole to report the treatment that she felt was unjust and retaliatory.

In March of 2000, a temporary anchor position opened up when one of WOI's anchors went on maternity leave. In light of the representation that Parker had made when he hired her, Henthorn believed that she should be given a chance to apply for the position. Henthorn was aware that a fellow employee was interviewing for the position, but when she asked Parker if others were being given the opportunity to do so, he said "no." Upper management ultimately selected another employee for the temporary position.

Frustrated and discouraged by what she considered her heavy work schedule and poor treatment, Henthorn resigned her position in May 2000. She filed a complaint with the Iowa Civil Rights Commission the following month. A copy of the charge was sent to WOI, but Parker never received his copy because he had been fired shortly after Henthorn left the station. After receiving a right-to-sue letter in November 2000, Henthorn filed the present action in federal district court, alleging hostile work environment, quid pro quo sexual harassment, and discriminatory retaliation.

## II.

Summary judgment is proper if, after viewing the evidence in a light most favorable to the nonmoving party, there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Evergreen Invs., 334 F.3d at 753. Mere allegations not supported with specific facts are insufficient to establish a material issue of fact and will not withstand a summary judgment motion. Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999). Only admissible evidence may be used to defeat such a motion, Shaver v. Independent Stave Co., 350 F.3d 716, 723 (8th Cir. 2003), and affidavits must be based on personal knowledge. Fed. R. Civ. P. 56(e).

Title VII prohibits employment discrimination based on sex and covers a broad spectrum of disparate treatment. 42 U.S.C. § 2000e-2; Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). When the discrimination is not patent, a plaintiff may still prevail by showing that the inappropriate conduct creates a "hostile work environment." See 29 C.F.R. § 1604.11(a)(3) (2004). A prima facie case for a hostile work environment requires proof (1) that plaintiff is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition or privilege of her employment. Duncan v. General Motors Co., 300 F.3d 928, 933 (8th Cir. 2002). The fourth element involves both objective and subjective components. Id. at 934. The harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe that her working conditions have been altered. Harris, 510 U.S. at 21-22. "There is no bright line between sexual harassment and merely unpleasant conduct . . . ." Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997). Accordingly, we view the "totality of the circumstances" in determining whether there is a hostile work environment. Klein, 198 F.3d at 709. Some of the factors we look to include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job. See Duncan, 300 F.3d at 934.

Henthorn also argues that she was subject to quid pro quo harassment. As our court has recognized, a claim of quid pro quo harassment often adds little to a

straightforward Title VII analysis. Forshee v. Waterloo Industries, Inc., 178 F.3d 527, 530 (8th Cir. 1999). Both quid pro quo and hostile work environment sexual harassment claims are grounded in the same legal theory under Title VII, the former involving an explicit, and the latter a constructive, change in conditions of employment. Burlington Industries v. Ellerth, 524 U.S. 742, 752 (1998). Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands. Id.; Forshee, 178 F.3d at 530. A plaintiff in that situation need not prove that the offensive conduct is severe or pervasive because any carried-out threat is itself deemed an actionable change in the terms or conditions of employment. Ellerth, 524 U.S. at 753-54. In this case, however, although Parker told Henthorn that he would tear up her first negative job performance memo if she would have a drink with him, his conditional promise/implied threat proved to be hollow in light of his destruction of the memo despite Henthorn's refusal to accede to his request. There was therefore no actionable change in Henthorn's employment, and so we instead look upon Parker's conditional offer as constituting another factor in analyzing whether Henthorn was the victim of a hostile work environment.

To overcome summary judgment on her hostile work environment claim, Henthorn must present evidence from which a reasonable jury could find that Parker's conduct towards her was more than merely offensive, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment. See, e.g., Duncan, 300 F.3d 928 (finding plaintiff failed to prove a hostile work environment claim when she was asked out, criticized, asked to sketch pottery with a sexual theme, and unnecessarily touched on the hand); Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 980 (8th Cir. 2003) (finding to be inappropriate but not actionable conduct that involved frequent calls to plaintiff's home, regular visits to her office, the bestowing of gifts, the touching of plaintiff's arm, and the frequent expressions of "I love you"). The conduct "must be extreme and not merely rude or unpleasant" before it can be said to have, in an

objective sense, affected the terms and conditions of employment.[3] <u>Alagna</u>, 324 F.3d at 980.

We agree with the district court that Henthorn established the first three elements of a prima facie case: she is a member of a protected class; she was subjected to unwelcome advances by defendant Parker; and the harassment was based on her sex. The principal issue is whether her proffered evidence was such that a reasonable person could find from it that Henthorn had been subjected to a work environment so hostile that "a term, condition, or privilege of [her] employment" was altered. <u>Duncan</u>, 300 F.3d at 934. Having examined the totality of the circumstances, we conclude that although Parker's comments and actions were inappropriate, immature, and unprofessional, they did not cross the high threshold required to support a claim of sexual harassment. Parker's requests that Henthorn go out with him were repetitive and annoying, but they were not lewd or threatening. Parker did not touch Henthorn inappropriately, nor did he make sexual comments about her in

---

[3]The conduct that we have found sufficient to establish a prima facie case of discrimination was far more severe or pervasive than the conduct Henthorn describes. For example, we have found to be actionable conduct that involved pervasive sexual innuendo and repetitive offensive touching. <u>See, e.g.</u>, <u>Eich v. Bd. of Regents for Cent. Mo. St. Univ.</u>, 350 F.3d 752, 755-56 (8th Cir. 2003) (finding conduct sufficiently severe when plaintiff was frequently touched in numerous suggestive ways and was subject to simulated sex acts.); <u>Beard v. Flying J., Inc.</u>, 266 F.3d 792, 797 (8th Cir. 2001) (affirming a judgment for plaintiff based on another employee brushing, rubbing and flicking plaintiff's breasts and pointing to his crotch); <u>Howard v. Burns Bros, Inc.</u>, 149 F.3d 835, 838 (8th Cir. 1998) (describing a co-employee constantly saying sexual innuendos, brushing up against plaintiff and telling lewd jokes with gestures); <u>Smith v. St. Louis Univ.</u>, 109 F.3d 1261, 1262-63 (8th Cir. 1997) (reversing summary judgment for the employer where plaintiff faced consistent ridicule and derogatory comments about women, even though they were not sexually explicit); <u>Hathaway</u>, 132 F.3d 1214, 1217-18 (finding a jury reasonably ruled for plaintiff when she was subject to two offensive touchings, followed by constant snickering and gutteral noises from two other employees).

her presence.[4]  His two late-night/early morning calls urged her to accept his social invitations and expressed his interest in her, but they did not contain sexual propositions.  Although Henthorn was made uncomfortable by Parker's conduct, she was able to continue to perform her assignments, and Parker's actions did not result in a change of her probationary status.  Accordingly, we conclude that the district court did not err in ruling that Henthorn had failed to establish the existence of a trial-worthy question of fact on her hostile work environment claim.

## III.

We turn, then to Henthorn's contention that she suffered retaliation as a result of her complaints of harassment. To establish a prima facie case of retaliation, Henthorn has the burden to show that she engaged in protected activity, that Parker or WOI took adverse action against her, and that there was a causal connection between those two actions.  Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997).  Each action claimed to be retaliatory must be sufficiently adverse to have created a material change in the employment, "such as a change in salary, benefits, or responsibilities." LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 691 (8th Cir. 2001).  Not everything that makes an employee unhappy constitutes an actionable adverse employment action.  Id.  A negative employment review, for example, is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment.  Spears v. Mo. Dep't of Corr. & Human Resources, 210 F.3d 850, 854 (8th Cir. 2000).  Minor changes in duties or working conditions that do not result in materially significant disadvantage "do not meet the standard of an adverse

---

[4]The sexual comments that Parker allegedly made about Henthorn, only one of which is supported by admissible evidence, were both spoken to others.  He stated on various occasions that Henthorn was "hot."  His alleged statement that Henthorn had "nice rack" appears in the record only by way of inadmissible hearsay. See Shaver, 350 F.3d at 723.

employment action . . . ." Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999).

If the plaintiff establishes a prima facie case of retaliation, we proceed to analyze the case under the burden-shifting analysis set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). We examine whether the defendant has offered a legitimate, nondiscriminatory reason for its actions and whether the plaintiff has presented any evidence that the explanation given is pretextual. See Turner v. Honeywell Fed. Mfg. & Techs., L.L.C., 336 F.3d 716, 723 (8th Cir. 2003).

Henthorn alleges several instances of retaliation. She contends, first, that Parker prepared both of the negative job performance memos because she had refused his advances. She next contends that Parker refused to allow her to audition for the temporary anchor position, contrary to the promise he had made during her interview, because of her December 17 internal complaint. Finally, she contends that, again as a result of her complaint, Parker became excessively critical of her work in comparison to that of others and caused her to be scheduled for more work and less important assignments.

We conclude that Henthorn has failed to establish a genuine issue of material fact on her retaliation claim. First, she did not make a prima facie case, because the alleged retaliatory actions were not sufficiently adverse to constitute an actionable employment action. Although Henthorn became unhappy and felt overly scrutinized after she rejected Parker's repeated requests for social engagements and after she lodged the internal complaint, the terms and conditions of her employment did not change. She continued to receive the same salary and was given the same responsibilities. Second, even if she had made a prima facie case, WOI submitted evidence of nondiscriminatory reasons for both the negative job performance memos and the temporary anchor position choice, and Henthorn provided no evidence to support an inference that such explanations were pretextual. She acknowledges that

her work was not of the same quality as that of other employees, an admission supported by the deposition testimony of several individuals. Likewise, she offered no evidence to dispute the fact that it was General Manager Cole, who at the time was unaware of Henthorn's displeasure with and rejection of Parker's overtures, who had noted the deficiencies in Henthorn's job performance and who had directed Parker to write the memos outlining those deficiencies. In sum, then, no reasonable trier of fact could find from the proffered evidence that Henthorn suffered retaliation as a consequence of her refusal to accede to Parker's requests.

The judgment is affirmed.

_____