Abby Lynn **PORTNER,** Michelle Crowley, and Erin Gronvall, Plaintiffs,

v.

**CICA SA–BO, INC,** a domestic corporation d/b/a Great Clips Defendant.

No. CIV. 04–1377MJDJGL.

United States District Court, D. Minnesota.

Feb. 22, 2005.

Donald Harold Nichols and Michele R. Fisher, Nichols, Kaster & Anderson, PLLP, Minneapolis, MN, for Plaintiffs.

Mark A. Greenman, Plymouth, MN, Ruth Y. Ostrom, Greenman & Ostrom, Minneapolis, MN, for Defendant.

## MEMORANDUM OF LAW & ORDER

DAVIS, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendant CICA SA–BO, Inc.'s Motion for Summary Judgment. [Docket No. 30] Having received and reviewed all of the parties' submissions regarding this motion, as well as the entire record in this case, the Court concludes that oral argument is unnecessary and will rule on the papers in this matter. Therefore, oral argument currently scheduled for Friday, February 25, 2005, is cancelled. For the reasons

that follow, Defendant's Motion for Summary Judgment is denied.

## II. FACTUAL BACKGROUND

### A. Introduction

Plaintiffs Abby Lynn Portner, Michelle Crowley, and Erin Gronvall worked as hair stylists at a Great Clips hair salon in St. Paul, Minnesota, until the summer or fall of 2003. The salon is owned by Defendant CICA SA–BO, Inc. Defendant is co-owned by Milosava Ljubisavljevic ("Millie") and her husband Bronko Ljubisavljevic ("Bronko"). Defendant employed approximately six stylists at the salon. Millie Aff. ¶ 4. The stylists were all female except for Bogic Ljubisavljevic ("Bogic"), Millie and Bronko's son, and Patrick Connolly, Plaintiffs' supervisor. Id. Bogic began working at the salon in January 2003. Bogic Dep. at 7. All three Plaintiffs allege that they were sexually harassed by Bogic. The following facts are those viewed in the light most favorable to Plaintiffs.

### B. Abby Portner

#### 1. Hostile Work Environment Allegations

In Portner's presence, Bogic would frequently motion towards his genitals and say, "Right here, baby." Portner Dep. at 37–38. He once stated that American girls wanted his body and his "Serbian sausage." Id. at 34–35. On another day, Bogic told Portner that women wanted his body because of his muscular stomach and grabbed Portner's hand and put it on his stomach. Id. at 36–37. He then put his hand on her stomach, and she pushed him away. Id. Bogic would often comment on the bodies of female customers, saying that they had "a cute ass" or that they were "so sexy," although Portner told him to stop making those comments. Id. at 42.

Portner complained about Bogic's behavior to Connolly more than once. Portner Dep. at 42–43. Although Connolly spoke to Bogic about the complaints, Bogic's behavior did not change. Id. at 44–45. Connolly told Portner that when he reported Plaintiffs' harassment allegations against Bogic to Millie, she stated that she did not believe that Bogic harassed anyone and that she believed that Plaintiffs were liars. Id. at 67–68. Millie also told Connolly that "boys will be boys and girls will be girls." First Connolly Dep. at 31.

October 14, 2003, was Portner's last day of work at Great Clips. On that day, Bogic turned his client's chair so that he and his male client could stare at Portner's female client as she walked out. Portner Dep. at 70. Bogic and his client talked about how good looking Portner's client was and laughed as she left. Id. at 70–71, 93. Bogic told Portner, "Well, at least I know of one single mom that is good looking," implying that Portner was not good looking. Id. at 93. Later, Bogic began to comment on Portner's body, stating that she had ugly, fat feet and no ankles, making Portner cry. Id. at 93–94. That afternoon, Bogic attempted to physically block Portner when she tried to move out of his way. Id. at 97–98. Portner told him to stop, but he twice blocked her and pressed his body against her back as she tried to move away from him. Id. at 98–99. Portner began crying and her co-worker called Connolly to report what had happened. Id. at 109.

With Connolly's permission, Portner left work that day, and both Millie and Connolly left messages at her home. In his message, Connolly stated that he had talked to Millie and that Millie did not believe Portner's story. Id. at 117. Portner never returned to work.

#### 2. Reprisal Allegations

In response to Portner's complaints about Bogic's harassment, which culminated on October 14, 2003, Defendant took no remedial action. Instead, Portner's super-

visor relayed to Portner Millie's belief that Portner was lying. Millie's response to Portner's allegations of sexual harassment was to instruct Connolly to "fire the bitch." Second Connolly Dep. at 51–52.

## C. Michelle Crowley

### 1. Hostile Work Environment Allegations

Crowley testified that Bogic would frequently state that everyone wanted his "Serbian sausage." Crowley Dep. at 22. He would also make a karate chop motion towards his genitals and say, "Right here, baby," as his customers were approaching the salon door. *Id.* at 22–24. He would make the same comment and gesture to Crowley when she would ask him if he wanted to take the next customer. *Id.* at 23. In response, Crowley would tell Bogic to stop, but he continued to make sexual comments. *Id.* at 29, 33.

Bogic also frequently physically harassed Crowley. He often put tips down Crowley's shirt, even though Crowley always told him to stop. Crowley Dep at 33. Bogic also rubbed his stomach against her back while she was standing and attempted to massage her shoulders. *Id.* at 38, 42. He did this multiple times and would giggle as he did it. *Id.* at 43. Crowley would tell him to move away or would hit him. *Id.* at 39, 43. Crowley complained to Connolly about Bogic's behavior, particularly his physical behavior regarding the tips, between twelve and thirty times. *Id.* at 30–31.

During the summer of 2003, Julie Stocksett, Crowley's client, had her hair cut by Bogic. Stocksett Aff. ¶ 3. During the haircut, Bogic was very flirtatious, asked Stocksett out on a date, and called her a "MILF," making her uncomfortable. *Id.* at ¶¶ 4–5. ("MILF" is a term from the movie American Pie, which means "Mother I'd Like to F* * *." Crowley Dep. at 57.) During the fall of 2003, Stocksett com- plained about Bogic's behavior to Crowley. Stocksett Aff. at ¶ 8; Crowley Dep. at 55– 57. Crowley reported Stocksett's complaint to Connolly, who reported the incident to Millie. *Id.* at 58–59. The next day, Millie came to the salon and discussed the MILF incident with Crowley. *Id.* at 59. When Crowley explained Stocksett's story, Millie told Crowley that Stocksett was a liar and that, because Crowley had two sons, someday she would understand Bogic's behavior. *Id.* at 60–61.

### 2. Reprisal Allegations

When Connolly reported Crowley's allegations of sexual harassment to Millie, Millie responded that Crowley and Connolly were liars and thieves. Crowley Dep. at 37; First Connolly Dep. at 57. After Crowley reported the MILF incident to Connolly and Millie, Millie immediately rejected Stocksett's allegations. Soon after Crowley's report, Defendant cut her hourly rate without telling her. Crowley Dep. at 70–71. Also after she reported Stocksett's allegations, Connolly told her that Millie believed Crowley was an "f'n liar" and an "f'n thief." *Id.* at 74. Defendant required Crowley to pay back vacation pay that she had received. *Id.* at 73. In November 2003, Defendant terminated Crowley over the telephone. Crowley Dep. at 16, 66–68. Millie told Crowley that she was terminated because Millie believed that if Crowley moved out of state, she would not give Defendant two week's notice. *Id.* at 68–69. After a heated telephone conversation between Millie and Crowley, Millie obtained a restraining order against Crowley and her boyfriend. Exh. 15 to Ostrom Aff.

## D. Erin Gronvall

### 1. Hostile Work Environment Allegations

Bogic chronically made sexual comments toward Gronvall and frequently touched

her in a sexual manner. Bogic frequently told her that she wanted his "Serbian sausage" and put tips down her shirt or the back of her pants. Gronvall Dep. at 22. He told Gronvall that he could make her sweat. *Id.* at 54. On one occasion, he stated, "I'm going to grab your butt." *Id.* at 26. He would pretend to reach for a broom in order to move his body close to hers. *Id.* at 23. She also heard Bogic rate clients "f\* \* \*ability" on a scale of one to ten. *Id.* at 50–51. Gronvall would respond by telling him that he was a "pig." *Id.* at 53. Bogic also told Gronvall that he had a conversation with teenage clients regarding sex toys. *Id.* at 38–40. Bogic would stand in the door and stick his stomach out to touch Gronvall when she tried to get through the door. *Id.* at 60–61. Bogic either rubbed his body against hers or acted as if he were going to do so almost every time Gronvall worked with him. *Id.* at 57.

Gronvall complained to Connolly about Bogic almost every day she worked with Bogic. *Id.* at 33. When Connolly reported her complaints to Millie, Millie stated that Gronvall was a liar and that Gronvall was flirting with Bogic. First Connolly Dep. at 60. Despite Gronvall's complaints, Bogic's conduct continued. Gronvall Dep. at 37–38.

### 2. Reprisal Allegations

Toward the end of Gronvall's employment with Defendant, after Bogic's harassment had continued despite her complaints, she told Connolly that she did not want to be scheduled to work alone with Bogic. *Id.* at 63. She stated that she was tired of his behavior, that he was lazy, that he made her feel uncomfortable, and that when she went home she felt like she needed to take a shower. *Id.* at 63.

Connolly told Gronvall that he would talk to Millie about her request. *Id.* at 64. Approximately one week later, when Gron-

vall called the salon to ask for her upcoming schedule, Connolly told her that she was no longer on the schedule. *Id.* at 64–65, 74–75. He told that she was off of the schedule because he could not schedule her around Bogic's schedule. *Id.* at 75.

In March 2004, Portner filed a Complaint against Defendant alleging hostile work environment sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Minnesota Human Rights Act, Minn.Stat. § 363A.03, *et seq.,* ("MHRA"); and reprisal in violation of Title VII and the MHRA. Crowley and Gronvall filed a separate Complaint asserting the same four claims against Defendant. On November 22, 2004, Crowley and Gronvall's case was consolidated with Portner's case. Defendant has now moved for summary judgment on all claims against it.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "[S]ummary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based." *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir.1998).

"[A] party cannot avoid summary judgment by contradicting his own earlier testimony." *Prosser v. Ross,* 70 F.3d 1005, 1008 (8th Cir.1995). Additionally, a plain-

tiff cannot "avoid summary judgment by proffering testimony from another person that contradicts the plaintiff's own testimony." *Id.* In denying Defendant's Motion for Summary Judgment, the Court has not relied on Connolly's testimony to the extent that it clearly and directly contradicts Plaintiffs' testimony or his own testimony in his earlier deposition. However, the Court will not disregard testimony based on Defendant's assertion that Connolly was a hostile deposition witness or had a particular bias. It is the province of the jury, not the Court, to determine the credibility and bias of witnesses. *United States v. Armstrong,* 462 F.2d 408, 411 (8th Cir. 1972) (citing *Evans v. United States,* 326 F.2d 827, 831–32 (8th Cir.1964).).

### B. Hostile Work Environment Claims

Because Minnesota courts look to Title VII case law to analyze MHRA claims, the Court will analyze Plaintiffs' Title VII hostile work environment claims and MHRA hostile work environment claims together. *See Mems v. City of St. Paul, Dept. of Fire and Safety Servs.,* 327 F.3d 771, 785 n. 11 (8th Cir.2003) (analyzing MHRA hostile work environment claim under Title VII case law).

> To establish a sexually hostile work environment in violation of Title VII, a plaintiff has to establish that (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action.

*Phillips v. Taco Bell Corp.,* 156 F.3d 884, 888 n. 4 (8th Cir.1998). Defendant asserts that Plaintiffs cannot meet the fourth and fifth elements of their hostile work environment claim. The Court disagrees; all three Plaintiffs have presented evidence

sufficient for a jury to find that they have met all five elements.

Plaintiffs have established the first and second elements because all three Plaintiffs are females and were subject to uninvited and offensive verbal and physical conduct of a sexual nature. The evidence of Bogic's sexual comments and unwelcome touching is extensive. For example, all three Plaintiffs regularly heard Bogic talk about how women wanted his "Serbian sausage" or state, "Right here, baby," while gesturing towards his genitals. Despite Plaintiffs' requests that he stop, Bogic discussed female customers in a sexual manner—rating them on their "f* * *ability," calling a customer a MILF, and commenting that they were "so sexy" or had a "cute ass." Bogic rubbed his body against each Plaintiffs' back at least twice despite their protests. He put tips down the shirt or pants of two Plaintiffs.

Plaintiffs have met the third element because they were subject to Bogic's harassment but Connolly, the male employee, was not. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1378 (8th Cir.1996) ("Evidence that members of one sex were the primary targets of the harassment is sufficient to show that the conduct was gender based for purposes of summary judgment."). Additionally, Bogic's comments, such as stating that Plaintiffs wanted his "Serbian sausage" or rating female customers on a "f* * *ability" scale, demonstrate that his actions were motivated by sexual desire.

Plaintiffs have met the fourth element by providing evidence of sexual harassment that was "sufficiently severe or pervasive 'to alter the conditions of [their] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citation omitted). Bogic's conduct was "sufficient to

create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir.1998) (citations omitted). He regularly made explicit and offensive sexual comments both to Plaintiffs and to and about female customers. He pressed his body up against each Plaintiff against her will multiple times. He also forced Portner's hand onto his stomach and put tips down the shirts and pants of Gronvall and Crowley numerous times. Bogic's harassment caused Crowley and Portner to leave the salon crying and caused Gronvall to request that Defendant not schedule her to work alone with him. His behavior was frequent, at times physical, and humiliating. All three Plaintiffs complained about Bogic's harassment to Connolly, their supervisor, yet Bogic's harassment did not stop after their complaints.

Bogic's conduct was at least as severe as conduct found in previous Eighth Circuit cases in which the court held that the plaintiff was entitled to a trial. *See, e.g., Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir.1998) (holding that there was sufficient evidence of a hostile work environment for jury to find for the plaintiff when co-worker "brushed against [plaintiff] behind the fuel desk," co-worker's "sexual innuendos were chronic," the conduct upset plaintiff and "she complained about his 'ridiculous' conduct"); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 762 (8th Cir.1998) (holding employer was not entitled to summary judgment when a supervisor "pats a female employee on the back, brushes up against her, and tells her she smells good").

Finally, Plaintiffs have met the fifth element. Each Plaintiff complained to Connolly about Bogic's behavior, but Bogic's harassment did not stop. Connolly relayed complaints about Bogic's sexual harassment to Millie at least four times. First Connolly Dep. at 34. Additionally, each Plaintiff received the message that Millie would not believe their allegations. When Crowley reported the MILF incident to Millie, Millie told Crowley that Stocksett was a liar and that because Portner had two boys, someday she would understand Bogic's behavior. When Portner left work on October 14, 2003, after severe harassment by Bogic, Connolly left a message on Portner's home telephone that Millie did not believe Portner's allegations against Bogic. Millie responded to Gronvall's allegations by calling her a liar and accusing her of flirting with Bogic. Finally, Connolly testified that when he relayed Plaintiffs' sexual harassment complaints to Millie, she responded that Plaintiffs were liars. Despite being aware of Plaintiffs' complaints, Defendant failed to take appropriate remedial action.

## C. Reprisal Claims

■ To establish a prima facie case of Title VII retaliation, a plaintiff must show: (1) she engaged in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse employment action. *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028 (8th Cir.2004). Once a plaintiff has established a prima facie case of retaliation, the employer must articulate a legitimate, nondiscriminatory reason for its action. *Id.* The plaintiff then has the burden to show that the articulated reason was pretext; in other words, she must raise a genuine issue of material fact regarding whether the employer in fact took an adverse employment action because of her protected activity. *Id.* Minnesota courts analyzes MHRA reprisal claims under the same burden-shifting formula used in Title VII

actions. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn.1999).

█ In this case, Plaintiffs engaged in a protected activity by repeatedly complaining to their supervisor about Bogic's sexual harassment. *See* 42 U.S.C. § 2000e–3; Minn.Stat. § 363A.15(1).

█ Portner has raised a genuine issue of material fact regarding whether she was constructively discharged by presenting evidence of "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004). Portner left work on October 14, 2003, after Bogic had laughed and stared at female customer while commenting on her attractiveness, commented that Portner was unattractive, told her that she had ugly, fat feet and no ankles, attempted to physically block her path as she tried to move away from him, and twice pressed his body against her back after she told him to stop. That day was the culmination of ongoing harassment. Portner left the salon in tears. Defendant responded to her allegations in the following manner: Millie told Connolly to fire her, and Connolly left a message on Portner's home telephone that Millie did not believe Portner's allegations against Bogic. Bogic's actions, coupled with Defendant's failure to protect Plaintiffs from his ongoing harassment after their numerous complaints to Connolly, which he relayed to Millie, created an intolerable working environment because she "reasonably believe[d] there [wa]s no chance for fair treatment." *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 574–75 (8th Cir.1997) ("A reasonable jury could find that the continuing harassment and management's indifference rendered [the plaintiff's] working conditions intolerable and forced her to quit.").

█ Crowley was also subject to adverse employment actions: Defendant reduced her pay, reduced her hours, rescinded her vacation pay, and, ultimately, terminated her. Gronvall was also subject to an adverse employment action when Defendant terminated her employment.

Portner has established a clear causal connection between her constructive discharge and her complaints of sexual harassment. As noted above, she felt forced to leave work after enduring ongoing sexual harassment culminating in Bogic commenting on her body and pressing himself against her multiple times. After Portner left work crying due to Bogic's actions, Defendant responded to Portner's report of sexual harassment by taking no remedial action. Instead Millie directed Connolly to fire Portner, and Connolly told Portner that Millie did not believe her allegations. This occurred after Millie had previously refused to consider Portner's previous complaints.

Crowley has produced adequate evidence of a causal connection by showing that Defendant took a number of escalating adverse employment actions, culminating in termination, shortly after Crowley's complaint to Millie regarding the MILF incident. Additionally, Millie strongly expressed her view that Crowley was a liar because she alleged that Bogic was sexually harassing her and then took adverse employment actions against Crowley based on her opinion that she was not trustworthy.

Gronvall has produced adequate evidence of a causal connection between her complaints about Bogic's sexual harassment and her termination. Millie responded to her allegation of sexual harassment by stating that Gronvall was lying and flirting. When Defendant failed to take steps to prevent Bogic's harassment after Gronvall's numerous complaints, Gronvall requested that she not be forced to work alone with Bogic due to his harassment.

Only a few workdays later, Defendant took Gronvall off of the work schedule completely, terminating her employment. Gronvall's manager told her that her termination was due to the fact that Defendant could not schedule her around Bogic's schedule.

Defendant has responded with nondiscriminatory explanations for its actions against each Plaintiff. It alleges that Portner's decision to quit was not reasonable and that her refusal to discuss the harassment allegations directly with Millie precludes a finding of constructive discharge. It claims that it cut Crowley's pay and hours in order to reduce payroll costs because Crowley was the highest paid employee at the salon. Additionally, it rescinded her vacation pay because, as a part-time employee, she was not entitled to it. It claims that it terminated her employment after her boyfriend threatened Millie. Finally, Defendant claims that Gronvall was unreliable and that her full-time job as an apartment manager prevented her from working the hours that Defendant needed.

Although Defendant has offered nondiscriminatory reasons for its actions, Plaintiffs have presented sufficient evidence to survive summary judgment by raising a genuine issue of material fact regarding whether the true reason for Defendant's adverse employment actions was retaliation. Plaintiffs' evidence shows that Millie refused to believe their reports of sexual harassment and responded by calling them liars. After Portner was driven home by verbal and physical harassment, Millie instructed Connolly to fire her, and Connolly left a message with Portner that Millie did not believe that she was telling the truth. Crowley produced evidence that Defendant's escalating adverse employment actions occurred closely in time after her complaint and stemmed from Millie's disbelief of Crowley's allegations. Gronvall has presented evidence that Millie instructed Connolly to fire her because of her complaints about Bogic and that she was terminated a short time after her request to not be forced to work alone with Bogic.

The Court has reviewed the record and concludes that genuine issues of material fact preclude summary judgment on all of Plaintiffs' claims.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

Defendant's Motion for Summary Judgment [Docket No. 30] is **DENIED.**